CONTROL SOLUTIONS, INC.
and United Phosphorous,
Inc., Appellants,

v.

GHARDA CHEMICALS
LTD., Appellee.

No. 01–06–00802–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 13, 2007.

George Howard Lugrin, Karen K. Milhollin, John Michael Threadgill, Westmoreland Hall, P.C., Houston, for Appellant.

John P. Abbey, Spagnoletti & Co., John B. Wallace, Lyman, Twining, Weinberg & Ferrell, P.C., Houston, John Chadwick Gauntt, Gauntt & Kruppstadt, L.L.P., The Woodlands, for Appellee.

Panel consists of Chief Justice RADACK and Justices KEYES and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

Appellants, Control Solutions, Inc. and United Phosphorous, Inc. (collectively, "CSI"), file this interlocutory appeal challenging the trial court's order that granted the special appearance motion of Gharda Chemicals, Ltd. ("Gharda Chemicals"). In four issues, CSI argues that the trial court erred when (1) it ruled that it did not have specific jurisdiction over Gharda Chemicals; (2) it failed to consider Gharda Chemicals's post-injury contacts with Texas in its general jurisdictional analysis; (3) it did not find the exercise of jurisdiction reasonable in light of traditional notions of fair play and substantial justice; and (4) it ruled that jurisdiction over Gharda Chemicals could not be imputed through the application of the alter ego, single business enterprise, and agency doctrines.

We reverse and remand.

### Facts

Control Solutions is a Texas corporation that, among other things, mixes and sells insecticides. Its principal place of business is located in Harris County, Texas. Mark Boyd serves as the president of Control Solutions.

Gharda Chemicals is an Indian corporation with several manufacturing facilities in India. It was founded by Dr. Keki Gharda, its chairman, managing director, and principal shareholder, in 1964.

Sometime in the 1990s, Gharda Chemicals began manufacturing Chlorpyrifos, an insecticide, and Dicamba, an herbicide, and decided to enter the United States market. After its first attempt at entering that market failed, Gharda Chemicals hired Larry Miller as a consultant to aid in the registration of Chlorpyrifos and Dicamba with the Environmental Protection Agency ("EPA"); without registration, the chemicals could not legally be sold in the United States. Gharda Chemicals applied for registration in its own name in 1996, and the EPA conditionally approved the registration in early 1997.

In March 1997, Gharda Chemicals established Gharda USA, Inc. ("GUSA") as a wholly-owned subsidiary "specifically to

represent Gharda Chemical[s] in the United States." Gharda Chemicals solely capitalized GUSA and retained total ownership of all GUSA stock. Dr. Gharda and J.A. Somaiya, who are both directors of Gharda Chemicals, served as two of the four directors of GUSA. The third director was Uda Maroo, Gharda Chemicals' chief financial officer, and the fourth was Mamu Tabbaykan, the sole "US director." Anthony Maro became president of GUSA in 2000. As president of GUSA, Maro wrote monthly reports to Dr. Gharda that included how much product had been sold, to whom, and at what price; how much money was outstanding; and, according to Dr. Gharda, why Maro "constantly needed infusions of money from Gharda Chemicals to keep himself afloat."

After GUSA was formed, Gharda Chemicals transferred the EPA registrations for Chlorpyrifos and Dicamba to GUSA; but, according to Maro, GUSA made no cash payments for these transfers because there was "no money to do that with, and . . . no assets to do it with." Ten million dollars that Gharda Chemicals had paid to Dow Chemicals and BASF for the right to cite their data to the EPA for registration purposes were transferred onto GUSA's books. Gharda Chemicals also initially paid for GUSA's membership in various task forces because, according to Dr. Gharda, "GUSA was just a shell company initially. It didn't . . . have any business. So it didn't have any resources to pay." GUSA was thus created, owned, and controlled by Gharda Chemicals and served as the U.S. distributor for Chlorpyrifos and Dicamba.

In making purchases of the Chlorpyrifos manufactured by Gharda Chemicals, Boyd, the president of Control Solutions, initially dealt with Miller, the consultant who had been hired by Gharda Chemicals. During his deposition, Boyd testified that when he was dealing with Miller, he believed Miller to be associated with Gharda Chemicals because "his stuff that came to me [Boyd] said 'Agent of Gharda Chemical[s]'" and he said that he was "[a]n agent for Gharda Chemical[s]" and "worked for Dr. Gharda." Boyd also testified that he did not know that GUSA existed until he began dealing with Maro and learned that Maro worked for GUSA. Boyd further testified that Maro did not make pricing decisions but "went back to Dr. Gharda to get all these decisions made" and that "typically, it was Dr. Gharda that cut the deals with me."

Sometime in 2002, at Dr. Gharda's request, Boyd traveled from Texas to Chicago to meet with Dr. Gharda. According to Boyd, he and Dr. Gharda discussed "what new products Dr. Gharda could make for [Boyd] in India to sell in Texas" and how they could sell more Chlorpyrifos and Dicamba. Boyd suggested that they could sell substantial quantities of Chlorpyrifos if the price were lowered and they entered into the professional termiticide market, which later happened. According to Dr. Gharda, a significant amount of its sales of both Chlorpyrifos and Dicamba, amounting to millions of dollars, "were centered around Control Solutions."

In October 2002, Hoshang Patel, a member of Gharda Chemicals's board of directors, accompanied Maro, GUSA's president, on a visit to Control Solutions. At his deposition, Patel explained that the purpose of his visit was to let Control Solutions know that Gharda Chemicals "was also interested in the products sold here," that it "was watching this deal," and if there were ever a problem, Gharda Chemicals would "stand by its products." Gharda also provided support by communicating with Howard Stoddard of Control Solutions regarding the procedure for melting Chlorpyrifos and providing other

technological support when GUSA's representatives were not able to answer customers' questions.

On March 8, 2004, 32 drums containing the solid chemical Chlorpyrifos, which had been manufactured by Gharda Chemicals in India, sold to Control Solutions by Gharda Chemicals's wholly-owned subsidiary, GUSA, and subsequently shipped from India to Houston, Texas, were placed in a "hot box" in Control Solutions' warehouse for melting pursuant to a procedure received from Gharda Chemicals. Each drum had been sealed at Gharda Chemicals's plant in India, and the seals on the drums were not broken until immediately before the drums were put in the hot box. At some point during the melting process, the Chlorpyrifos caught on fire and blew open the doors of the hot box. The fire spread throughout the warehouse and to a second building. Everything inside those two buildings was destroyed, including some inventory belonging to United Phosphorous. Subsequent analysis by Control Solutions revealed that the drums of Chlorpyrifos were contaminated with flammable chemicals.

In September 2004, Gharda Chemicals dissolved GUSA. GUSA's assets were transferred to Gharda Chemicals and, according to Patel, GUSA "stop[ped] doing business" and "Gharda Chemicals ... stepped into the same offices with the same employees, same warehouse, same customers and start[ed] doing business."

On December 1, 2004, Control Solutions filed suit against several parties, including GUSA and Gharda Chemicals, for products liability, breach of express warranty, breach of implied warranty of merchantability, and negligence. At some point thereafter, United Phosphorous intervened in Control Solutions' suit. On January 14, 2005, Gharda Chemicals filed a special appearance with the trial court contesting the court's exercise of personal jurisdiction over it. The trial court granted the special appearance without issuing findings of fact or conclusions of law. CSI filed this interlocutory appeal.

## Personal Jurisdiction

In its first issue, CSI argues that the stream of commerce doctrine confers specific personal jurisdiction over Gharda Chemicals.

### Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law subject to de novo review. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002); *Glattly v. CMS Viron Corp.*, 177 S.W.3d 438, 445 (Tex.App.-Houston [1st Dist.] 2005, no pet.). The trial court, however, must frequently resolve questions of fact before deciding the jurisdictional question. *BMC Software*, 83 S.W.3d at 794. When the trial court issues findings of fact and conclusions of law, we may review the findings of fact on legal and factual sufficiency grounds and review the conclusions of law de novo as a legal question. *Silbaugh v. Ramirez*, 126 S.W.3d 88, 94 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (citing *BMC Software*, 83 S.W.3d at 794). If the trial court does not issue findings of fact and conclusions of law, as here, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795. In other words, if the trial court does not issue findings of fact, a reviewing court should presume that the trial court resolved all factual disputes in favor of its judgment. *Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.*, 184 S.W.3d 242, 246 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex.2002)). These findings are not conclusive when the

appellate record includes both the reporter's and clerk's records, and they may be challenged for legal and factual sufficiency on appeal. *Id.* To the extent that the underlying facts are undisputed, however, we conduct a de novo review. *Glattly,* 177 S.W.3d at 445.

■■■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software,* 83 S.W.3d at 793. A nonresident defendant challenging the court's exercise of personal jurisdiction through a special appearance carries the burden of negating all grounds for personal jurisdiction alleged by the plaintiff. *Id.; Glattly,* 177 S.W.3d at 446.

### Texas Long–Arm Statute and Due Process

■■■ Two requirements must be met before a Texas court can exercise personal jurisdiction over a nonresident defendant: (1) the Texas long-arm statute must authorize the exercise of jurisdiction and (2) the exercise of jurisdiction must be consistent with guarantees of due process. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *Tri–State,* 184 S.W.3d at 248.

■■■ The Texas long-arm statute permits Texas courts to exercise personal jurisdiction over a nonresident[1] defendant that "does business" in Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997); *BMC Software,* 83 S.W.3d at 795. The statute lists three activities that constitute "doing business": (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042. This list, however, is not exclusive,[2] and the statute's "doing business" requirement is limited only by the requirements of federal due process guarantees. *Koll Real Estate Group, Inc. v. Purseley,* 127 S.W.3d 142, 146 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

■■■ With respect to personal jurisdiction, federal due process requires two things. First, the nonresident defendant must have purposefully established such minimum contacts with the forum state that the defendant could reasonably anticipate being sued there. *Glattly,* 177 S.W.3d at 447 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985)). A nonresident establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in the state. *Moki Mac,* 221 S.W.3d at 575 ("defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction"); *Koll,* 127 S.W.3d at 146. It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum-contacts analysis. *Trigeant Holdings, Ltd. v. Jones,* 183 S.W.3d 717, 725 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). Random, fortuitous, or attenuated acts, or the unilateral acts of a third party, are not sufficient to confer personal jurisdiction. *Id.* Although not determinative, foreseeability is an important consideration in deciding whether a non-

---

1. A "nonresident" includes "an individual who is not a resident of [Texas]" and "a foreign corporation, joint-stock company, association, or partnership." TEX. CIV. PRAC. & REM.CODE ANN. § 17.041 (Vernon 1997).

2. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).

resident defendant has purposefully established minimum contacts. *Glattly*, 177 S.W.3d at 446–47.

Second, if the nonresident defendant has purposefully established minimum contacts with the forum, the exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. *Id.* at 447 (citing *Burger King*, 471 U.S. at 476–77, 105 S.Ct. at 2184–85). As to fairness, the defendant bears the burden of presenting a "compelling case" that exercising jurisdiction over him would not be fair and just. *See id.* at 450. Only in rare cases will a Texas court's exercise of personal jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).

We, therefore, analyze Gharda Chemicals's contacts with Texas to determine whether they satisfy the "minimum contacts" requirement of due process under the Texas long-arm statute and the Fourteenth Amendment. If so, we must determine whether the Texas courts' exercise of jurisdiction over Gharda Chemicals comports with traditional notions of fair play and substantial justice.

***Minimum Contacts***

The minimum contacts element of due process is divided into specific and general personal jurisdiction. *Glattly*, 177 S.W.3d at 447; *Moki Mac*, 221 S.W.3d at 575–76; *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990) (explaining that United States Supreme Court has "refined the minimum contacts analysis by identifying recurring fact patterns and outlining guidelines for application of the due process test to these patterns"—*i.e.*, specific and general jurisdiction).

A court may exercise general jurisdiction over a nonresident defendant if the defendant's contacts with the forum state are continuous and systematic, even if the cause of action did not arise from or relate to the defendant's contacts with the forum. *Glattly*, 177 S.W.3d at 447. This inquiry demands that all contacts be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity. *Schlobohm*, 784 S.W.2d at 359.

A court may exercise specific jurisdiction over a nonresident defendant if his alleged liability arises out of or is related to an activity conducted within the forum. *Moki Mac*, 221 S.W.3d at 576; *Glattly*, 177 S.W.3d at 446 (citing *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996)). The contacts must be purposefully directed at the forum and have a "substantial connection" with the forum state that results in the alleged injuries. *Burger King*, 471 U.S. at 473–76, 105 S.Ct. at 2182–84; *Moki Mac*, 221 S.W.3d at 584–85; *Shell Compañia Argentina de Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 837 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). In considering specific jurisdiction, we focus our analysis on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76.

Here, CSI argues that the Texas courts have specific personal jurisdiction over Gharda Chemicals under the stream of commerce doctrine.

*Stream of Commerce Doctrine*

The stream of commerce doctrine stems from *World–Wide Volkswagen Corp. v. Woodson*, in which the United States Supreme Court stated, "The forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdic-

tion over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." 444 U.S. 286, 297–98, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Later, however, in *Asahi Metal Industry Co. v. Superior Court of California, Solano County,* a plurality of the Court held that the placement of a product into the stream of commerce, absent additional conduct indicating an intent to serve the market of the forum state, is not an act of the defendant purposefully directed toward the forum state. 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987); *CSR,* 925 S.W.2d at 595. Likewise, the Texas Supreme Court has held that "the mere sale of a product to a Texas resident will not generally suffice to confer specific jurisdiction upon our courts. Instead, the facts alleged must indicate that the seller intended to serve the Texas market." *Moki Mac,* 221 S.W.3d at 577 (citing *CSR,* 925 S.W.2d at 595; *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032). This rule accords with the due process requirement that a nonresident defendant must take action that is purposefully directed towards the forum state. *Id.* (citing *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032).

 In determining whether the defendant purposefully directed action towards Texas, we may look to conduct beyond the particular business transaction at issue, as "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State." *Moki Mac,* 221 S.W.3d at 577 (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032). Some examples of "additional conduct" that may indicate an intent to serve the market of the forum state are: (1) designing the product for the market in the forum state; (2) advertising in the forum state; (3) establishing channels for provid-

ing regular advice to customers in the forum state; and (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. *Asahi,* 480 U.S. at 111, 107 S.Ct. at 1032.

 Intent to serve the Texas market alone is not sufficient, however, to confer specific jurisdiction over a foreign defendant. For a Texas court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) not only must the defendant have established minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, but also (2) the defendant's liability must have arisen from or be related to those contacts. *Moki Mac,* 221 S.W.3d at 576 (citing *Am. Type Culture,* 83 S.W.3d at 806).

We, therefore, examine the record for evidence both that Gharda Chemicals purposefully directed acts towards Texas indicating that it intended to serve the Texas market and that its liability arises from its contacts with Texas.

*Purposeful Availment*

In *CSR,* the Texas Supreme Court held that the nonresident defendant did not purposefully direct any act toward Texas indicating that it intended to serve the Texas market. 925 S.W.2d at 596. In that case, CSR, an Australian company, sold 363 tons of asbestos to another company in Australia, which then shipped the asbestos to Houston where it was used to manufacture pipe. *Id.* at 593–94. In reaching its conclusion, the Supreme Court noted that CSR did not advertise its asbestos in Texas, provide advice to Texas buyers, have any sales agents in Texas, or create, control, or employ the distribution system that brought the asbestos to Texas, and there was no direct evidence that CSR knew that the 363 tons of asbestos would be distributed in Texas. *Id.* at 595–96.

Likewise, in *Michiana Easy Livin' Country, Inc. v. Holten*, the Texas Supreme Court held that Michiana did not have the requisite minimum contacts with Texas for jurisdiction to attach. 168 S.W.3d 777 (Tex.2005). In that case, Holten, a Texas resident, telephoned Michiana in Indiana and purchased an RV, which Michiana shipped to Holten in Texas at Holten's expense. *Id.* at 784. A dispute arose, and Holten sued Michiana in Texas. *Id.* at 781. Michiana had no employees or property in Texas, was not authorized to do business in Texas, did not advertise in Texas or over the internet, and had not solicited business from anyone in Texas, including Holten. *Id.* at 784. "Michiana's only contact with Texas was Holten's decision to place his order from there." *Id.* at 794. Thus, the Supreme Court held that there was no conduct by Michiana purposefully establishing minimum contacts that justified the exercise of specific jurisdiction over Michiana by the Texas courts. *See id.*

 Here, the factual situation is virtually the opposite of that in *CSR* and *Michiana*. Gharda Chemicals began manufacturing Chlorpyrifos in the 1990s and decided to enter the U.S. market. In March 1997, it established a wholly owned and controlled subsidiary, GUSA, to market its chemicals in the United States. Gharda Chemicals obtained EPA registration for Chlorpyrifos and Dicamba and then transferred the EPA registration for Chlorpyrifos to GUSA. Gharda and GUSA established an on-going business relationship with Control Solutions in Texas for the sale of Gharda Chemicals's products, which were manufactured in India and shipped to Texas pursuant to contract.

Boyd, president of Control Solutions, initially dealt with Miller, who, according to Boyd, was working as an agent for Gharda Chemicals. Boyd later dealt with Maro, the president of GUSA, but testified that Maro did not make pricing decisions, but "went back to Dr. Gharda" for pricing decisions, and that "typically it was Dr. Gharda that cut the deals with [Boyd]." In October 2002, Patel accompanied Maro on a visit to Control Solutions. At his deposition, Patel explained that the purpose of his visit was to let Control Solutions know that Gharda Chemicals "was also interested in the products sold here," "was watching this deal," and if there was ever a problem, Gharda Chemicals would "stand by its products." Also in 2002, at Dr. Gharda's request, Boyd traveled to Chicago to meet with Dr. Gharda. According to Boyd, he and Dr. Gharda discussed "what new products Dr. Gharda could make for [Boyd] in India to sell in Texas" and how they could sell more Chlorpyrifos and Dicamba. Boyd suggested that they could sell substantial quantities of Chlorpyrifos if the price were lowered and they entered into the professional termiticide market, which later happened. A very significant amount of Gharda Chemicals's sales in the United States of both Chlorpyrifos and Dicamba "were centered around Control Solutions."[3] Thus, Gharda Chemicals had both direct and indirect systematic contacts with Control Solutions in Texas.

Several months after the fire in Texas that gave rise to this litigation, Gharda Chemicals dissolved GUSA, absorbed its assets, and undertook direct operations in the United States. According to Patel, a member of Gharda Chemicals's board of directors, GUSA "stop[ped] doing business" and "Gharda Chemicals ... stepped into the same offices with the same em-

---

**3.** Upon questioning by plaintiff's counsel, Patel admitted that of the 50 states, Texas is ranked in the top five as a market for Gharda Chemicals's products.

ployees, same warehouse, same customers and start[ed] doing business."

Based on the foregoing, we conclude that Gharda Chemicals established minimum contacts with Texas because it purposefully availed itself of the privileges and benefits inherent in conducting business in Texas. *See Koll*, 127 S.W.3d at 146; *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (defining "doing business").

*Liability Related to Forum Contacts*

■ For specific jurisdiction purposes, however, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts. *Moki Mac*, 221 S.W.3d at 579. In assessing the strength of the necessary connection, the Texas Supreme Court has held that "for a nonresident's forum contacts to support an exercise of jurisdiction, there must be a *substantial connection* between those contacts and the operative facts of the litigation." *Id.* at 585 (emphasis added).

In *Moki Mac*, the Texas Supreme Court held that the nonresident defendant's activities in Texas were not sufficiently related to the facts of the litigation. *Id.* at 588. In that case, the plaintiffs' 13–year-old son died on a river rafting trip in Arizona with Moki Mac, a Utah-based river rafting outfitter. *Id.* at 573. Although Moki Mac had not directly solicited the plaintiffs to participate in the trip, the court found that Moki Mak had purposefully availed itself of the privileges and benefits inherent in conducting business in Texas by selling rafting trips to Texas residents; purposefully directing marketing efforts to Texas with the intent to solicit business from the state; regularly advertising in Texas; hiring public relations firms to target media groups and tour operators, some of which were located in Texas; soliciting Texas residents through mass and targeted direct-market-

ing e-mail campaigns; compiling and obtaining a mailing list that included Texas residents; and utilizing particular customers, some of whom were located in Texas, to act as *de facto* group leaders for the planning, organizing, and promoting of trips. *Id.* at 577–78. The court held, however, that the relationship between these contacts and the operative facts of the litigation—the guides' conduct on the rafting trip and whether they exercised reasonable care in supervising the plaintiffs' son—were "too attenuated to satisfy specific jurisdiction's due-process concerns." *Id.* at 585, 588.

■ Here, in contrast, in March 2004, 32 drums containing Chlorpyrifos, which had been manufactured by Gharda Chemicals in India, were sold to Control Solutions in Texas by GUSA, shipped directly from India to Texas, and stored in Control Solutions' warehouse in Texas. The drums were unsealed and placed in a "hot box" for melting pursuant to a procedure received by Control Solutions from Gharda Chemicals. Each drum had been sealed at Gharda Chemicals's plant in India, and the seals on the drums were not broken until immediately before the drums were put in the hot box. Sometime during the melting process, the Chlorpyrifos caught on fire and blew open the doors of the hot box. The fire spread throughout the warehouse and to a second building. Everything inside those two buildings was destroyed, including inventory belonging to United Phosphorous. Subsequent analysis by Control Solutions revealed that the drums of Chlorpyrifos were contaminated with flammable chemicals.

CSI alleged four causes of action against Gharda Chemicals: (1) strict products liability; (2) breach of express warranty; (3) breach of implied warranty of merchantability; and (4) negligence. All four causes of action center around the allegation that

the drums of Chlorpyrifos put in the hot box in March 2004 were contaminated with flammable chemicals, which ultimately caused the fire at Control Solutions. Thus, the operative facts of the litigation concern the fire and the contamination of the drums of Chlorpyrifos, and the related questions of (a) whether this contamination rendered the Chlorpyrifos defective, (b) whether the delivery of the contaminated drums breached an express warranty, the implied warranty of merchantability, or both, and (c) whether Gharda Chemicals exercised reasonable care in the manufacture and packaging of the Chlorpyrifos.

Given the facts of this case, we conclude that Gharda Chemicals's liability "arises from or relate[s] to the forum contacts." *See Moki Mac,* 221 S.W.3d at 579. Because Gharda Chemicals purposefully availed itself of the privileges and benefits of doing business in Texas and because its alleged liability arises from or relates to the forum contacts, the minimum contacts prong of personal jurisdiction is satisfied.

### Fair Play and Substantial Justice

■ Having found that Gharda Chemicals purposefully established minimum contacts with Texas, we must consider whether the exercise of personal jurisdiction over it comports with traditional notions of fair play and substantial justice. *See Glattly,* 177 S.W.3d at 447 (citing *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184–85). In making this inquiry, we consider, when appropriate, (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental, substantive social policies. *Guardian Royal,* 815 S.W.2d at 231.

■ First, there is no undue burden on Gharda Chemicals in defending this case in Texas. Gharda Chemicals owns 100% of the stock of GUSA, which has not contested the trial court's exercise of jurisdiction and against whom CSI's suit will go forward here in Texas. Moreover, Gharda Chemicals has been directly conducting business in Texas since dissolving GUSA and purchasing all of its assets in September 2004.

Second, Texas has an interest in resolving this dispute because it involves injury to a Texas corporation and Texas has a substantial interest in protecting its citizens against harm from dangerous products entering this state. *See Gen. Refractories Co. v. Martin,* 8 S.W.3d 818, 823 (Tex.App.-Beaumont 2000, pet. denied) (finding that Texas has a manifest interest in protecting residents exposed to products alleged to be unreasonably dangerous).

Third, as a Texas resident, Control Solutions can obtain the most convenient and efficient relief in Texas. Fourth, the efficient resolution of this controversy is promoted by adjudication in Texas because none of the other parties have contested jurisdiction; and trying CSI's suit against Gharda Chemicals in Texas will avoid duplication of efforts and minimize the possibility of inconsistent findings on common issues. *See J.D. Fields & Co. v. W.H. Streit, Inc.,* 21 S.W.3d 599, 605 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (finding efficient resolution of controversy promoted by adjudication in Texas because suit against defendant company's surety was still pending in Texas and reconsolidating suit against defendants with suit against surety avoided duplication of efforts and minimized possibility of inconsistent findings on common issues). We do not address the fifth factor, as only one state is involved in this dispute.

Accordingly, we hold that the exercise of personal jurisdiction over Gharda Chemicals does not offend traditional notions of fair play and substantial justice. *Glattly*, 177 S.W.3d at 447 (citing *Burger King*, 471 U.S. at 476–77, 105 S.Ct. at 2184–85). The exercise of personal jurisdiction over Gharda Chemicals is supported by the evidence and is, therefore, proper.

We sustain CSI's first issue.[4]

### Conclusion

We reverse the order of the trial court that granted Gharda Chemicals's special appearance and remand the cause to the trial court for further proceedings consistent with this opinion.

---

**4.** Because our resolution of CSI's first issue is dispositive of this appeal, we need not reach CSI's remaining issues. *See* Tex.R.App. P. 47.1.