Affirmed and Opinion filed December 9, 2008








Affirmed and Opinion filed December 9, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00279-CV

____________

 

PULMOSAN SAFETY EQUIPMENT
CORPORATION,
Appellant

 

V.

 

WILLIAM LAMB, Appellee

 



 

On Appeal from the 295th
Judicial District Court

Harris County, Texas

Trial Court Cause No. 2005-66013

 



 

O P I N I O N

This
interlocutory appeal contests the denial of a special appearance filed by
appellant, Pulmosan Safety Equipment Co. (APulmosan@), in multi-district silica
litigation.  Pulmosan sought its dismissal from the litigation based on lack of
personal jurisdiction.  Although declining to exercise general jurisdiction
over Pulmosan, the trial court found that it could exercise specific
jurisdiction.  We affirm.








I.  Background

Appellee,
William Lamb (ALamb@), is a Texas resident who, over the course of his forty-year career,
worked as a painter, insulator, and sandblaster at a paper mill in Evadale,
Texas.  Lamb claims that, as a result of his sandblasting duties in Texas, he
contracted silicosis.  

Pulmosan
was a New York corporation operating from 1926 until its voluntary dissolution
under the New York dissolution statute in 1986.  It manufactured personal
protective equipment for use in the abrasive-blasting industry.  Lamb alleges
that he used the Pulmosan H-30 series sandblast hood from the late 1960's to
mid 1970's while working in Evadale, Texas. The H-30 hood protected the user=s face, head, and shoulders from the
ricochet of sandblasting.  It was a non-airfed canvas hood, tannish brown in
color, that draped over the user=s head and shoulders.  The number of
H-30 hoods manufactured per year during the relevant time frame of the 1960's
through 1975 is disputed.  There is both evidence that production was in the Atens of thousands@ and evidence that it was only one to
two thousand per year.  It is undisputed, however, that the hoods were
manufactured by Pulmosan in New York.

The method
of sale and distribution of the H-30 hood in Texas.

Pulmosan
did not sell directly to end-users such as Lamb, or even to his employers. 
Instead, Pulmosan sold its products through distributors and what it called Aoriginal equipment manufacturers@ (AOEMs@).  Pulmosan described the
distributors as Asimply Pulmosan=s wholesale customers -- the >accounts [Pulmosan was] selling to.=@  OEMs were companies that ultimately
sold the equipment to employers and end-users, either under the Pulmosan label
or under a private label.  Pulmosan=s corporate representative, Howard
Weiss, characterized the distributors and OEMs as independent third-parties who
were not controlled or employed by Pulmosan.  








Pulmosan
had several Texas distributors and OEMs selling its equipment in Texas during
the time period Lamb claimed to have used the H-30 hoods.[1] 
One of the OEMs was a Houston-based company called Clemtex.  Clemtex began
selling H-30 hoods in Texas in 1955 and continued selling them until 1982.  A
Clemtex representative testified that Clemtex purchased 99.9 percent of the
hoods directly from Pulmosan.  Initially, the Pulmosan hoods Clemtex sold had a
Pulmosan label, but eventually Clemtex furnished Pulmosan with Clemtex labels
to be affixed to the hoods.  Weiss referred to this practice as Aprivate-labeling.@  There is evidence that Clemtex sold
safety equipment to Lamb=s employer during the relevant time period.  There is no
direct evidence, however, that Clemtex sold the H-30 hood that Lamb allegedly
used. 

Beginning
in the late 1960's or early 1970s, Pulmosan placed an employee in the
Dallas-Fort Worth area.  The employee=s job was to call on distributors and
sell Pulmosan=s products.  The employee=s territory encompassed three or four states, including
Texas, Oklahoma, Louisiana, and possibly Arkansas.  This employee later became
a Amanufacturer=s representative,@ rather than a direct employee of
Pulmosan, and Pulmosan continued to have a manufacturer=s representative in Texas for the
last fifteen or twenty years of its existence.  The manufacturer=s representatives sold Pulmosan=s products on commission.  During
this time, Pulmosan had a Certificate of Authority on file with the State of
Texas for the purpose of transacting business in the state.

Pulmosan
also advertised its products throughout the United States in catalogs. 
Pulmosan normally sent the catalogs to anyone who was purchasing from them, Awhether distributors, dealers, or OEM
accounts.@  The 1964 catalog identified five warehouses across the United States
for Pulmosan products, including one in Houston, Texas.  The warehouse was
owned and operated by a Pulmosan manufacturer=s representative.  








Instructions
for product use were included in the product boxes and in the catalogs that
Pulmosan sent to whoever bought equipment from Pulmosan.  Pulmosan relied on
the employers to make sure the employee was properly instructed and the
equipment properly maintained.  

The
evidence of use of the Pulmosan H-30 hood by Lamb.

During
his deposition, Lamb testified that he used a grey hood that had a Clemtex
label on it and a brown hood that had no label on it.  He said he did not know
who manufactured the brown hood.  After his deposition, Lamb submitted an
affidavit stating that he used a Pulmosan H-30 hood, and he attached to the
affidavit Pulmosan catalog pictures identifying the hood.  Pulmosan objected to
this affidavit as conclusory and inconsistent with Lamb=s prior deposition testimony that he
did not know who manufactured the hood.  The trial court overruled Pulmosan=s objections.  Although Pulmosan does
not challenge the trial court=s rulings on these objections, it challenges the legal
sufficiency of the affidavit.

Pulmosan
also submitted an expert witness affidavit by Robert Sheriff, the president of
a consulting company providing industrial safety and hygiene services.  Sheriff
stated that, during the 1960's and 1970's there were multiple manufacturers of
the abrasive blasting hoods and that the hoods were very similar in description
and appearance.  AMost non-air fed hoods that were sold in the 1960's and
1970's were so similar in appearance that they are indistinguishable without a
label identifying the manufacturer.@

Lamb
brought suit against numerous manufacturers and suppliers of sand and abrasive
blasting equipment and protective gear.  Lamb asserted claims for negligence,
products liability (design and warning defect), and gross negligence.  The suit
was transferred to the silica multi-district litigation pending in Judge Tracy
Christopher=s court.








Pulmosan
filed a special appearance, plea to the jurisdiction, and answer.  Before it
heard Pulmosan=s special appearance, the trial court abated the proceedings so that
certain plaintiffs in the multi-district litigation could proceed in a New York
state court to obtain a ruling on the viability of their claims in light of
Pulmosan=s dissolution.  The New York court
ruled that the dissolution of Pulmosan was not effective as to those plaintiffs
whose causes of action arose prior to the date of dissolution.  Ford v.
Pulmosan Safety Equip. Corp., 13 Misc.3d 1242(A), 831 N.Y.S.2d 353, 2006 WL
3437670, at *7 (Sup. Ct. Queens Co. 2007).  The New York court specified that a
viable claim against Pulmosan would Adepend upon when these plaintiffs were
first exposed to silica dust or, more accurately, upon the initial use of
Pulmosan=s defective safety equipment.@  Id.

The
trial court in this case denied Pulmosan=s special appearance based on a
finding that it could exercise specific jurisdiction over Pulmosan.  The trial
court found that during the pertinent time of Lamb=s use of the hood, Pulmosan intended
to serve the Texas market.  The court thus found specific jurisdiction under Moki
Mac River Expeditions v. Drugg.  221 S.W.3d 569 (Tex. 2007).  The trial
court also held that general jurisdiction did not exist.  Under PHC-Minden,
L.P. v. Kimberly-Clark Corp., a trial court must assess contacts
over a reasonable number of years.  235 S.W.3d 163 (Tex. 2007).  Up to the date
of this lawsuit, Pulmosan had not done business, in Texas or elsewhere, since
its dissolution in 1986.  Lamb has not appealed the trial court=s ruling on general jurisdiction. 
Rather, Pulmosan exclusively challenges the trial court=s exercise of specific jurisdiction,
claiming (1) Pulmosan lacked sufficient minimum contacts with Texas; and in any
event there was no substantial connection between any of its contacts and the
litigation; and (2) its dissolution deprived the trial court of jurisdiction.

II.  Standards of Review








Whether
a trial court has personal jurisdiction over a defendant is a question of law
this court reviews de novo.  Moki Mac, 221 S.W.3d at 574; Kelly v.
General Interior Constr., Inc., 262 S.W.3d 79, 83 (Tex. App.CHouston [14th Dist.] 2008, pet.
filed).  The trial court, however, must often resolve questions of fact before
deciding the jurisdictional question.  BMC Software Belgium, N.V. v. Marchand,
83 S.W.3d 789, 794 (Tex. 2002).  In considering the denial of a special
appearance, the court determines only the issue of jurisdiction, not
liability.  Kelly, 262 S.W.3d at 83.  In determining jurisdictional
pleas asserted by a defendant, we take as true the pleadings and allegations of
the plaintiff and review the pleadings and allegations in the light most
favorable to the plaintiff.  See Tex. Dept. of Transp. v. Ramirez, 74
S.W.3d 864, 867 (Tex. 2002) (holding that in considering jurisdictional motions,
the reviewing court construes the pleadings in the plaintiff=s favor); Kelly, 262 S.W.3d at
84 n.3.

The
plaintiff bears the initial burden of pleading sufficient allegations to invoke
the jurisdiction of the Texas long-arm statute.  Am. Type Culture Collection
v. Coleman, 83 S.W.3d 801, 807 (Tex. 2002).  The nonresident defendant then
has the burden of negating all bases of jurisdiction asserted in the plaintiff=s allegations.  BMC Software,
83 S.W.3d at 793.    

III.  Personal Jurisdiction

In its
first issue, Pulmosan challenges the trial court=s exercise of specific jurisdiction
based on the claims asserted against it by Lamb.  Texas courts may assert
personal jurisdiction over a nonresident defendant if (1) the Texas long-arm
statute authorizes the exercise of jurisdiction; and (2) the exercise of
jurisdiction is consistent with federal and state constitutional due-process
guarantees.  Moki Mac, 221 S.W.3d at 574.  The Texas long-arm statute
provides in pertinent part that a non-resident does business in Texas if it Acommits a tort in whole or in part in
this state.@  Tex. Civ. Prac. & Rem. Code ' 17.042(2).  The Texas long-arm
statute, however, reaches only Aas far as the federal constitutional requirements of due
process will allow.@  Guardian Royal Exch. Assurance, Ltd. v. English China
Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991). 








Federal
due-process limitations are satisfied if the nonresident defendant has
established minimum contacts with the forum state and the exercise of
jurisdiction comports with A>traditional notions of fair play and
substantial justice.=@ Moki Mac, 221 S.W.3d at 575
(citing Int=l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  A
nonresident establishes minimum contacts with Texas by purposefully availing
itself of the privileges and benefits inherent in conducting business in the
forum state. Id.; Control Solutions, Inc. v. Gharda Chemicals Ltd.,
245 S.W.3d 550, 557 (Tex. App.CHouston [1st Dist.] 2007, no pet.).  Sellers who create Acontinuing relationships and
obligations with citizens of another state@ are subject to jurisdiction based on
their activities in the forum state.  Michiana Easy Livin= Country, Inc. v. Holten, 168 S.W.3d 777, 785 (Tex. 2005). 
In assessing minimum contacts, the quality and nature of the contacts, rather
than their number, are determinative.  Control Solutions, 245 S.W.3d at
557.  Random, fortuitous, or attenuated acts, or unilateral acts of
third-parties, are not sufficient.  Michiana, 168 S.W.3d at 785.  

A
nonresident manufacturer need not have offices or employees in the forum state
to meet the purposeful availment test.  Id.  Under the stream of
commerce theory, a corporation who delivers its products into the stream of
commerce with the expectation that they will be purchased by consumers in the
forum state is subject to jurisdiction in suits arising from that activity.  See
World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980). 
Pluralities of both the U.S. Supreme Court and the Texas Supreme Court have
held, however, that the mere sale of a product to a resident is not sufficientBthe allegations must also indicate an
intent to serve the forum market.  Asahi Metal Ind. Co. v. Superior Court,
480 U.S. 102, 112 (1987); Moki Mac, 221 S.W.3d at 577.  Examples of Aadditional conduct@ that may evidence an intent to serve
the forum market are: (1) designing the product for the market in the forum
state; (2) advertising in the forum state; (3) establishing channels of regular
communication with customers in the forum state; and (4) marketing the product
through a distributor who has agreed to serve as the sales agent in the forum
state.  Asahi Metal, 480 U.S. at 112. 








In the context of specific jurisdiction, intent to serve the
Texas market is still not alone sufficient to confer jurisdiction over a
nonresident defendant.  To assert specific jurisdiction over a nonresident
defendant, the allegations must also indicate that the defendant=s liability arises from or relates to
the defendant=s minimum contacts with the forum state.  Moki Mac, 221 S.W.3d at
576.  A defendant=s liability arises from or relates to its minimum contacts
when there is a substantial connection between the defendant=s contacts and the operative facts of
the litigation.  Id.

A.  Pulmosan=s Minimum Contacts with Texas.

In
determining whether, under the stream of commerce theory, the trial court
properly found it could exercise specific jurisdiction over Pulmosan, we must
examine the record for evidence that: (1) Pulmosan purposefully directed acts
towards Texas indicating that it intended to serve the Texas market; and (2)
Pulmosan=s liability arises from or relates to
its contacts with Texas.  See Moki Mac, 245 S.W.3d at 577, 585.  

1.  Moki
Mac

Our
inquiry into Pulmosan=s purposeful direct acts toward Texas begins with an
examination of Moki Mac, the supreme court=s recent seminal pronouncement on
specific jurisdiction.  221 S.W.3d 569.  In Moki Mac, the plaintiffs= minor son died while on a
river-rafting trip in Arizona with Moki Mac River Expeditions, a Utah-based
company.  Id. at 573.  The court examined two sets of facts in
determining whether the Utah company had purposefully availed itself of the
forum state.  First, the court reviewed Moki Mac=s marketing efforts in Texas and
found that Moki Mac knowingly sold rafting trips to Texas residents and
purposefully directed marketing efforts to Texas with the intent to solicit
business from this state. Id. at 577.  Moki Mac solicited Texas
residents through mass and targeted direct-marketing email campaigns, sending
brochures and trip information to people who had previously expressed interest
in a trip, offering Afree floats@ to customers who coordinated a group of ten or more (at
least two Texas residents earned the Afree float@) and paying a fee to a travel agency
located in Houston, resulting in multiple trips involving Texas residents.  Id.
at 578.








Second,
the defendant in Moki Mac established Achannels of regular communication
with its customers in Texas.@  Id.  The defendant set up particular customers as de
facto group leaders to plan, organize, and promote its trips and had a
Texas resident serve as a group leader.  Id.  In fact, the trip the
plaintiffs= son attended was planned by the Texas group leaderBthe plaintiffs were not directly
solicited by Moki Mac.  Id.  Moki Mac kept the communication channels
open by automatically sending information regarding new trips, schedules, and
prices to those on its mailing list who had been a customer or who had
expressed an interest in a trip within a three-year period.  Id.  The
Court found that Moki Mac=s advertisements directed toward Texas and its use of
channels of regular communication with its customers showed an intent by Moki
Mac to serve the Texas market, thus satisfying the purposeful availment prong. 
Id. at 578-79.

2.  Evidence
of Pulmosan=s direct acts toward Texas.

Like the
defendant in Moki Mac, Pulmosan set up channels of regular communication
with Texas customers.  It had distributors and OEMs in Texas that sold its
products to Texas residents.  During the relevant time period, Pulmosan had an
employee in Texas whose duties included calling on the Texas distributors to
sell Pulmosan=s products.  Pulmosan later had manufacturer=s representatives whose territory
included Texas and who also called on Texas distributors.  The representatives
were paid commissions from Pulmosan for the sale of its products.  Placing a
sales representative in the state to call on Texas distributors to sell
Pulmosan=s products shows an intent to serve
the Texas market.[2]  See Asahi
Metal, 480 U.S. at 112 (marketing product through distributor who has agreed
to serve as the sales agent in the forum state showed purposeful availment). 
Moreover, the manufacturer=s representatives are similar to the de facto group
leaders the nonresident defendant used in Moki Mac and which evidenced
an intent to serve the Texas market.  Moki Maci, 221 S.W.3d at 578.









Also
like the defendant in Moki Mac, Pulmosan regularly sent its catalogs to Aanyone who was buying from it,@ including the Texas distributors and
OEMs.  One of the Pulmosan OEMs was Clemtex, a Texas-based company who sold
hoods to Lamb=s employer.  In fact, Weiss testified that Pulmosan sold products to
Clemtex Afor a good many years.@  In its 1964 catalog, Pulmosan
advertised several warehouses across the United States for its products,
including one in Houston, Texas.  Pulmosan had a certificate of authority to do
business in Texas.  This evidence is sufficient to show that, during the time
Lamb claimed to have used Pulmosan hoods, Pulmosan purposely directed its
products toward Texas showing an intent to serve the Texas market.  See id.;
Control Solutions, 245 S.W.3d at 561.  

Pulmosan
argues that the evidence does not show purposeful availment because the
distributors and OEMs were independent third parties, and Michiana tells
us that shipping products in response to actions by third parties is not
sufficient.  Pulmosan=s reliance on Michiana is misplaced.  In that case, an
R.V. manufacturer sent one product into Texas at the unilateral request of a
Texas resident.  Michiana, 168 S.W.3d at 787.  Unlike Michiana,
Pulmosan was not passively sitting in its shop in New York when one Texas
resident called on the phone to purchase a product.  Pulmosan sent products
into Texas for Aa good many years@ and utilized a sales employee and
manufacturer=s representatives to call on and solicit sales from Texas residents.  The
fact that the distributors and OEMs were independent of Pulmosan does not
shield it from jurisdiction.  See Moki Mac, 221 S.W.3d at 578 (use of de
facto group leaders, who were not agents or employees of the company, to
plan, organize, and promote trips to Texas residents was evidence of purposeful
availment); Control Solutions, 245 S.W.3d at 560-61 (use of independent
Texas company to distribute products was evidence of intent to serve Texas
market).








Pulmosan
contends that the warehouse in Houston also cannot support jurisdiction because
it was owned and operated by an independent manufacturer=s representative.  This argument,
however, ignores the fact that Pulmosan chose to advertise the warehouse in its
catalog; it was not the unilateral act of a third party.  Pulmosan advertised
the availability of its products in Texas, thus showing an intent to serve the
Texas market. 

In sum,
the evidence shows that Pulmosan set up a chain of distribution of its products
aimed at Texas, through the use of Texas distributors and OEMs, as well as a
sales employee and manufacturer=s representatives.  This evidence satisfies the purposeful
availment prong of the jurisdictional test.

3.  Evidence of a
substantial connection between Pulmosan=s contacts and the operative facts of the litigation.

In Moki Mac, the Texas Supreme Court analyzed in depth
the due process requirement that a nonresident defendant=s contacts with the forum must Aarise out of or relate to@ the litigation in order to support
specific jurisdiction.  Moki Mac, 221 S.W.3d at 579-85.  After reviewing
various approaches applied by other jurisdictions, the Court determined that,
under Texas law, there must be a substantial connection between the nonresident=s contacts and the operative facts of
the litigation.  Id. at 585.  To identify the operative facts of the
litigation, the Court selected those facts that would be the focus of the
trial.  Id.

Pulmosan
argues that there can be no substantial connection between its contacts and the
operative facts of the litigation because there is no evidence that Lamb ever
used a Pulmosan product.  Alternatively, Pulmosan contends that the evidence of
Lamb=s use is factually insufficient. 
Pulmosan further argues that no substantial connection exists because the
products were manufactured in New York, thus the case will involve only fact
questions as to whether the products were defective when they left Pulmosan in
New York.  We disagree with both arguments.








First,
whether Lamb actually used the Pulmosan hood is a merits-based question
that should not be resolved in a special appearance.  See Michiana, 168
S.W.3d at 790-91 (focusing on whether defendant actually directed a tort
towards Texas as a basis for jurisdiction improperly focuses on the merits
rather than defendant=s contacts with forum); Kelly, 262 S.W.3d at 83 (the
court should not determine underlying liability in special appearance); Weldon-Francke
v. Fisher, 237 S.W.3d 789, 792 (Tex. App.CHouston [14th Dist.] 2007, no pet.)
(at special appearance stage, merits of claim are not at issue).  Lamb does not
have to prove actual use at the special appearance stage; we take as true his
pleadings and allegations to decide this issue.  See Ramirez, 74 S.W.3d
at 867. The relevant point is that Lamb alleged he used the hood in Texas,
thereby shifting the burden to Pulmosan to negate jurisdiction.  See BMC
Software, 83 S.W.3d at 793. 

Second, even if it were not a merits-based question, there
is legally and factually sufficient evidence to support jurisdiction.  In
determining a legal sufficiency challenge, this court reviews the evidence in
the light most favorable to the challenged finding and indulges every
reasonable inference that would support it.  See City of Keller v. Wilson,
168 S.W.3d 802, 822 (Tex. 2005); Weldon-Francke, 237 S.W.3d at 792.  We
must credit favorable evidence if a reasonable factfinder could and disregard
contrary evidence unless a reasonable factfinder could not.  See
Weldon-Francke, 237 S.W.3d at 793.  We must determine whether the evidence
at trial would enable reasonable and fair-minded people to find the facts at
issue.  Id.  The factfinder is the sole judge of the credibility of the
witnesses and the weight of their testimony.  Id.  When reviewing a
finding for factual sufficiency, we consider and weigh all of the evidence in a
neutral light and conclude that the finding is not supported by sufficient
evidence only if the finding is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust.  See Cain v. Bain, 709
S.W.2d 175, 176 (Tex.1986) (per curiam).

Lamb stated in his deposition that he
used two different hoods during the late 1960's to early 1970's while
sandblasting at the Evadale paper mill.  One he identified as a gray hood with
a Clemtex label; the other hood he identified as a tannish brown hood that had
no label.  At his deposition, Lamb could not state who manufactured the tannish
brown hood.  After the deposition, however, Lamb submitted an affidavit with
his response to Pulmosan=s second amended special appearance that stated as follows:








Prior to August 1, 1986, I wore the H-30 Series
Sandblast Hoods manufactured by Pulmosan Safety Equipment Corporation
(hereinafter referred to as APulmosan@) while sandblasting.    

 

More specifically, while working for Mead Westvaco
Corporation f/k/a Temple Inland Forest Products f/k/a Eastex, Inc. located in
Texas (hereinafter referred to as AWestvaco@), a Evadale Company, from approximately 1969 until
the mid 1970's, I wore the Pulmosan H-30 hood.

 

Lamb then stated in his affidavit
that he had reviewed photographs of hoods in the Pulmosan catalogs and
identified the picture of the H-30 hood from the catalog, attaching catalog
photographs of the hood.  

Pulmosan contends that this evidence
is legally (and, alternatively, factually) insufficient because it is
conclusory and incompetent.  It points to the affidavit from its expert witness
Robert Sheriff stating that there were multiple manufacturers making hoods
similar to the Pulmosan H-30 and that the hoods were indistinguishable without
a label identifying the manufacturer.  Pulmosan also claims that the affidavit
is incompetent because it conflicts with Lamb=s prior deposition testimony and with
Sheriff=s uncontroverted affidavit.








Lamb=s allegation of use was not
conclusory but was based on an assertion of fact and the catalog pictures he
attached to the affidavit.  Lamb=s affidavit did not directly
contradict his deposition testimony.  In his deposition, Lamb simply could not
remember who manufactured the tannish brown hood and could not remember a
label.  After reviewing the catalog pictures, Lamb testified that he wore a
Pulmosan hood.[3] While it is
true that Pulmosan=s expert Robert Sheriff stated that the hoods were virtually
identical and indistinguishable without a label, he cannot conclusively  prove
that Lamb did not wear the H-30 hood.  Even though Sheriff=s affidavit may raise issues as to
the credibility of Lamb=s statement that he wore an H-30 hood, it simply raises a
fact issue to be determined by the finder of fact during the determination of
the merits of Lamb=s claims.  See Weldon-Francke, 237 S.W.3d at 793. 
Lamb alleged and submitted sworn testimony that he used a Pulmosan hood,
sufficient to withstand a legal and factual sufficiency challenge in this
special appearance.

Lamb has alleged claims for
negligence, products liability, and gross negligence.  His products liability
claim involves allegations of defective manufacture and design and lack of
adequate warning.  Pulmosan answered by asserting, among other things, that Lamb=s damages, if any, were caused by
improper use of its products, acts and/or omissions of his employer, and the Amanner, method, or condition under
which [Lamb=s] work was performed and over which Pulmosan had no control.@  In his deposition, Weiss explained
that a determination of whether the worker properly selected and used the H-30
hood would require information regarding the work conditions and the worksite,
including ventilation conditions and concentration levels of abrasive
material.  While it is true that the focus of the trial will include issues
relating to a product that was manufactured in New York and the conditions when
the product left New York, it will also include acts and omissions of persons
in Texas, the conditions of the worksite in Texas, and the use of the marketing
materials that were sent with the catalogs and product boxes to Texas.

This case is similar to Control
Solutions, a case involving an Indian company who manufactured chemicals in
India and then shipped them to Texas with instructions on how to melt the
chemicals upon arrival.  245 S.W.3d at 556.  The plaintiff brought suit because,
upon melting, the chemicals caught fire and caused damage to two buildings.  Id. 
The court held that a substantial connection existed between the minimum
contacts and the operative facts of the litigation, noting that the operative
facts Aconcern the fire and the
contamination of the drums of Chlorpyrifos, and the related questions of (a)
whether this contamination rendered the Chlorpyrifos defective, (b) whether the
delivery of the contaminated drums breached an express warranty, the implied
warranty of merchantability, or both, and (c) whether Gharda Chemicals
exercised reasonable care in the manufacture and packaging of the Chlorpyrifos.@  Id. at 562.  








The operative facts in Control
Solutions included actions that occurred outside of Texas (the manufacture
of the chemicals), as well as use and subsequent damage inside of Texas
(melting of the drums and the fire).  Likewise, the operative facts in this case
involve actions that occurred outside of Texas (the manufacture of the hoods in
New York) and use and subsequent damage inside of Texas (injury caused when
sandblasting and wearing the hoods in Texas).  As in Control Solutions,
the substantial connection element is satisfied.

Pulmosan challenges any finding that
a substantial connection exists by claiming that it would be based on an
impermissible Astacking of fortuities - such as: Pulmosan might have shipped an
H-30 hood to a Texas distributor, who might have been Clemtex, who might
have sold the hood to Lamb=s employer, who might have supplied the hood to Lamb,
who might have used the hood while sandblasting in the late 1960's.@  (emphasis in original).  The
fallacy of this argument, however, is that there is evidence in the record to
support each of these alleged fortuities: Pulmosan did ship hoods to Texas
distributors, including Clemtex (to whom it sold Aa good many years@), Clemtex did sell to Lamb=s employer (99.9 percent of the hoods
Clemtex sold were bought directly from Pulmosan), Lamb=s employer did supply a hood to Lamb,
and Lamb did use a hood while sandblasting in the late 1960's.  Pulmosan
believes that Lamb likely did not use a Pulmosan hood, but that is for the
factfinder to determine on the merits after reviewing all of the evidence.

IV. Fair Play and Substantial Justice

Once minimum contacts sufficient to
support jurisdiction are established, these contacts may be considered, in
light of other factors, to determine whether the assertion of personal
jurisdiction would comport with fair play and substantial justice.  Kelly,
262 S.W.3d at 87 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462,
476 (1985)).  The other relevant factors are: (1) the burden on the nonresident
defendant; (2) the forum state=s interest in adjudicating the dispute; (3) the plaintiff=s interest in obtaining convenient
and effective relief; (4) the interstate judicial system=s interest in obtaining the most
efficient resolution of controversies; and (5) the shared interest of the
several states in furthering substantive social policies.  Id.








Because the minimum contacts analysis
encompasses so many fairness factors, it has become less likely that the
exercise of jurisdiction will offend traditional notions of fair play and
substantial justice.  See Schlobohm v. Schapiro, 784 S.W.2d 355, 357-58
(Tex. 1990).  AThe question is whether, despite the existence of minimum contacts, there
is any reason why our assertion of jurisdiction in this case would offend
traditional notions of fair play and substantial justice.@  Id. at 359.  Only in rare
cases will the exercise of jurisdiction fail the fair-play analysis when the
defendant has purposefully established minimum contacts with the state and can
thus expect to be haled into a Texas court.  Guardian Royal, 815 S.W.2d
at 231. 

The only arguments made by Pulmosan
with regard to the fair-play analysis are that Texas does not have a strong
interest in adjudicating a dispute involving a dissolved New York corporation
and it would be just as convenient for the plaintiffs to litigate in New York. 
We disagree.  Texas has a strong interest in adjudicating disputes involving
Texas citizens such as Lamb.  See D.H. Blair Inv. Banking Corp. v. Reardon,
97 S.W.3d 269, 278 (Tex. App.CHouston [14th Dist.] 2002, pet. dism=d w.o.j.) (AThe state of Texas has an obvious
interest in providing a forum for resolving disputes involving its citizens,
particularly those disputes in which the defendant allegedly committed a tort
in whole or in part in Texas.@). Lamb has lived and worked in Texas for many years and it
would be more convenient for him to litigate in Texas.  Moreover, there is no
additional convenience to litigating in New York.  The New York court even
noted that, given the ongoing multi-district litigation, Texas is the more
appropriate forum for evidentiary hearings regarding plaintiffs= exposure to Pulmosan=s product.  Ford, 2006 WL
3437670, at *9.  

Lamb also points out that Texas has
created a depository for related litigation in the MDL, thus easing the burden
on Pulmosan.  Nothing in the record indicates that litigation in a Texas court
would be excessively burdensome or inconvenient to Pulmosan.  See Schlobohm,
784 S.W.2d at 359.  In fact, Pulmosan has been litigating silica claims in
Texas for many years.  The exercise of specific jurisdiction over Pulmosan
comports with traditional notions of fair play and substantial justice.








We overrule Pulmosan=s first issue arguing that Texas
cannot exercise specific jurisdiction over the claims asserted by Lamb.

V.  Pulmosan=s
Dissolution Argument

In its second issue, Pulmosan
asserts that the trial court could not exercise personal jurisdiction over it
because of its voluntary dissolution in 1986 under the New York dissolution
statute.  According to Pulmosan, the jurisdictional inquiry depends, as a
threshold matter, upon whether the claims survived its dissolution.  See
Gomez v. Pasadene Health Care Mgmt., Inc., 246 S.W.3d 306, 316 (Tex. App.CHouston [14th Dist.] 2008, no pet.)
(reviewing Texas dissolution statute and holding that failure to comply with
survival provision means there is no entity to be sued).  Whether the claims
survived Pulmosan=s dissolution is governed by the provisions of the New York
dissolution statute.  See Miller Mgmt. Co. v. State, 167 S.W.2d 728, 730
(Tex. 1943).

Under the New York dissolution
statute, a corporation=s dissolution does not Aaffect remedies against the
corporation for any >claim existing or any liability incurred before such
dissolution.=@  Ford, 2006 WL 3437670, at *5 (citing N.Y. Bus. Corp. Law ' 1006(b) (McKinney 2003)).  In ruling
on the Texas MDL plaintiffs= special action in New York, the New York state court thus
held:

Accordingly, as concerns the case at the bar, the
viability of the petitioner=s claims
against Pulmosan, and necessarily those of the other plaintiffs in the Texas
MDL, will depend upon when these plaintiffs were first exposed to silica dust
or, more accurately, upon the initial use of Pulmosan=s defective safety equipment.

 

Id. at *7.[4]








Pulmosan argues that there was no
evidence that Lamb used its product prior to Pulmosan=s dissolution and thus under the New
York court=s decision, Pulmosan=s voluntary dissolution cut off Lamb=s claim.  We disagree.  First, we do
not read the New York court decision to require, at this stage of the
litigation, proof of Lamb=s actual use of a Pulmosan product.  As discussed above,
actual use is a merits-based question that should not be resolved in a special
appearance.  See supra at 11-12.  Second, Lamb presented legally and
factually sufficient allegations and evidence of use prior to Pulmosan=s dissolution in 1986, sufficient to
withstand Pulmosan=s special appearance.  See supra at 12-14.  Pulmosan
is, of course, free to seek a determination on actual use at the merits stage
of the litigation.  We overrule Pulmosan=s second issue.

VII. Conclusion

We conclude that the pleadings and
the jurisdictional evidence establish the trial court=s specific jurisdiction over
Pulmosan.  We affirm the trial court=s order denying Pulmosan=s special appearance.+

/s/      Adele Hedges

Chief Justice

 

 

Judgment rendered and Opinion filed December 9, 2008.

 

Panel consists of Chief Justice Hedges and Justices Guzman
and Brown.









[1]  When asked whether he knew the type of plants,
factories, or contractors who would be the end users for the products, Weiss
said that almost every type of industry used them, but he did not know exactly
to whom the distributors sold Pulmosan products.  





[2]  Pulmosan argues that specific jurisdiction cannot
rest solely on the shoulders of this one sales representative.  There is
evidence, however, of other acts by Pulmosan showing an intent to serve the
Texas market.  See infra.  In addition, courts must look to the quality
and nature of the contacts rather than their number in determining purposeful
availment.  See Control Solutions, 245 S.W.3d at 557.  





[3]  Because Lamb did not clearly contradict his
deposition testimony without explanation, Pulmosan=s reliance on the Asham
affidavit@ theory is unavailing.  See Blan v. Ali, 7
S.W.3d 741, 746 n.3 (Tex. App.CHouston [14th
Dist.] 1999, no pet.).





[4]  Pulmosan appealed the New York trial court=s decision and the appellate court affirmed.  See
Ford v. Pulmosan Safety Equip. Corp., 862 N.Y.S.2d 56 (N.Y. App. Div. June
17, 2008).