Affirmed and Opinion filed December 9, 2008








Affirmed and Opinion filed December 9, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00885-CV

____________

 

JOHN S. MOORE, Appellant

 

V.

 

PULMOSAN SAFETY EQUIPMENT
CORPORATION,
Appellee

 



 

On Appeal from the 295th
Judicial District Court

Harris County, Texas

Trial Court Cause No. 2005-58856

 



 

O P I N I O N

This
appeal addresses the trial court=s jurisdictional ruling on a special
appearance filed by appellee, Pulmosan Safety Equipment Corporation (APulmosan@), in multi-district silica
litigation.  Appellant, John S. Moore (AMoore@), appeals the trial court=s order granting Pulmosan=s special appearance.  The trial
court found that it could exercise neither general nor specific jurisdiction
over Pulmosan.  Abandoning his general jurisdiction complaint, Moore argues
that Pulmosan waived its special appearance and that the exercise of specific
jurisdiction is proper.  We affirm the trial court=s ruling.








I.  Background

Moore is
an Alabama resident who worked as a sandblaster all over the United States. 
From 1968 to 1970, he worked as a sandblaster at the Uniroyal plant in Baton
Rouge, Louisiana while employed by a Texas company.  Moore alleges that he
contracted silicosis and massive fibrosis from his sandblasting duties in
Louisiana.  

Pulmosan
was a New York corporation operating from 1926 until its voluntary dissolution
under the New York dissolution statute in 1986.  It manufactured personal
protective equipment for use in the abrasive-blasting industry.  Moore alleges
that he used the Pulmosan H-30 series sandblast hood from 1968 to 1970 while
working in Baton Rouge.  The H-30 hood protected the user=s face, head, and shoulders from the
ricochet of sandblasting.  It was a non-airfed canvas hood, tannish brown in
color, that draped over the user=s head and shoulders.  The number of
H-30 hoods manufactured per year during the relevant time frame of the 1960's
through 1975 is disputed.  There is both evidence that production was in the Atens of thousands@ and evidence that it was only one to
two thousand per year.  It is undisputed, however, that the hoods were
manufactured by Pulmosan in New York.

The method
of sale and distribution of the H-30 hood in Texas.

Pulmosan
did not sell directly to end-users such as Moore, or even to his employers. 
Instead, Pulmosan sold its products through distributors and what it called Aoriginal equipment manufacturers@ (AOEMs@).  Pulmosan described the
distributors as Asimply Pulmosan=s wholesale customers -- the >accounts [Pulmosan was] selling to.=@  OEMs were companies that ultimately sold
the equipment to employers and end-users, either under the Pulmosan label or
under a private label.  Pulmosan=s corporate
representative, Howard Weiss, characterized the distributors and OEMs as
independent third-parties who were not controlled or employed by Pulmosan.  








Pulmosan had several Texas distributors and OEMs selling
its equipment in Texas during the time period Moore claimed to have used the
H-30 hoods.[1] 
One of the OEMs was a Houston-based company called Clemtex.  Clemtex began
selling H-30 hoods in Texas in 1955 and continued selling them until 1982.  A
Clemtex representative testified that Clemtex purchased hoods and 99.9 percent
of them were purchased directly from Pulmosan.  Initially, the Pulmosan hoods
Clemtex sold had a Pulmosan label, but eventually Clemtex furnished Pulmosan
with Clemtex labels to be affixed to the hoods.  Weiss referred to this
practice as Aprivate-labeling.@  There is
evidence that Clemtex sold safety equipment to Moore=s employer during
the relevant time period and that the employer provided a Pulmosan H-30 hood to
Moore.

Beginning in the late 1960's or early 1970's, Pulmosan
placed an employee in the Dallas-Fort Worth area.  The employee=s job was to call
on distributors and sell Pulmosan=s products.  The
employee=s territory
encompassed three or four states, including Texas, Oklahoma, Louisiana, and
possibly Arkansas.  This employee later became a Amanufacturer=s representative,@ rather than a
direct employee of Pulmosan, and Pulmosan continued to have a manufacturer=s representative
in Texas for the last fifteen or twenty years of its existence.  The
manufacturer=s representatives sold Pulmosan=s products on
commission.  During this time, Pulmosan had a Certificate of Authority on file
with the State of Texas for the purpose of transacting business in the state.








Pulmosan also advertised its products throughout the United
States in catalogs.  Pulmosan normally sent the catalogs to anyone who was
purchasing from them, Awhether distributors, dealers, or OEM
accounts.@  The 1964 catalog identified five warehouses across
the United States for Pulmosan products, including one in Houston, Texas.  The
warehouse was owned and operated by a Pulmosan manufacturer=s representative. 
Instructions for product use were included in the product boxes and in the
catalogs that Pulmosan sent to whoever bought equipment from Pulmosan. 
Pulmosan relied on the employers to make sure that the employee was properly
instructed and the equipment properly maintained.

Moore=s lawsuit and Pulmosan=s jurisdictional
challenges.

Moore brought suit against numerous manufacturers and
suppliers of sand and abrasive blasting equipment and protective gear,
asserting claims for negligence, products liability (defective manufacture and
design), conspiracy, and fraud.  Moore=s suit was
transferred to the silica multi-district litigation pending in Judge Tracy
Christopher=s court.

Pulmosan filed a special appearance and a plea to the
jurisdiction.  Before it heard Pulmosan=s special
appearance, the trial court abated the proceedings so that certain plaintiffs
in the litigation could proceed in New York state court to obtain a ruling on
the viability of their claims in light of Pulmosan=s dissolution. 
The New York court ruled that the dissolution of Pulmosan was not effective as
to those plaintiffs whose causes of action arose prior to the date of
dissolution, specifying its effectiveness would Adepend upon when
these plaintiffs were first exposed to silica dust or, more accurately, upon
the initial use of Pulmosan=s defective safety equipment.@

Thereafter, the trial court in Texas granted Pulmosan=s special
appearance with regard to general jurisdiction.  Under PHC-Minden, L.P. v.
Kimberly-Clark Corp., a trial court must assess contacts over a reasonable
number of years, up to the date of filing the lawsuit.  235 S.W.3d 163, 169
(Tex. 2007).  Pulmosan had not done business, in Texas or elsewhere, since its
dissolution in 1986.  The court thus held that general jurisdiction did not
exist.  Moore has not
appealed the trial court=s ruling on general jurisdiction.








The
trial court also granted Pulmosan=s special appearance for want of
personal jurisdiction on the basis of specific jurisdiction.  The court
held that it could not exercise specific jurisdiction over Pulmosan consistent
with the requirement of the claims arising out of or relating to the
defendant=s activity conducted within Texas.  Moki Mac River Expeditions v.
Drugg, 221 S.W.3d 569, 574 (Tex. 2007).  The trial court relied on the
following: (1) Moore used the Pulmosan product in Louisiana, not Texas; (2)
there were no pleadings or allegations of a tort=s occurrence in Texas; (3) there were
no allegations of representations or warranties made in Texas; (4) Pulmosan=s hood was not manufactured in Texas;
and (5) the mere fact that Pulmosan=s hood passed through Texas is not
sufficient to support specific jurisdiction.  Moore appeals the trial court=s ruling that specific jurisdiction
did not exist and that Pulmosan did not waive its special appearance.  The
trial court issued extensive findings of fact and conclusions of law.

II.  Waiver of Special Appearance?

In his
first issue Moore contends that the trial court erred in failing to find
Pulmosan waived its special appearance.  A defendant waives its right to
contest, under Texas Rule of Civil Procedure 120a, the trial court=s exercise of personal jurisdiction
over it when the defendant: (1) invokes the judgment of the court on any
question other than jurisdiction; (2) engages in acts that recognize an action
is properly pending; or (3) seeks affirmative action from the court.  See
Dawson-Austin v. Austin, 968 S.W.2d 319, 322 (Tex. 1998); Angelou v.
African Overseas Union, 33 S.W.3d 269, 275 (Tex. App.CHouston [14th Dist.] 2000, no pet.). 
We review a trial court=s finding with regard to waiver under a de novo standard of
review.  See, e.g., Exito Elecs. Co. v. Trejo, 142 S.W.3d 302,
304-05 (Tex. 2004) (per curiam).








In its
original special appearance pleading, Pulmosan asserted two grounds it claimed
warranted dismissal: (1) the trial court lacked jurisdiction over it because
after Pulmosan=s dissolution under the laws of the State of New York in 1986, there was
no longer an entity that could be sued; and (2) asserting jurisdiction over it
would offend traditional notions of fair play and substantial justice and would
be inconsistent with the due process clauses of the United States and Texas
constitutions.  The original special appearance pleading included neither the
words Apersonal jurisdiction@ nor an express argument that
Pulmosan lacked sufficient minimum contacts with the State of Texas to support
either general or specific jurisdiction.  Pulmosan later amended its special
appearance to assert these arguments.  Moore contends that Pulmosan=s failure to expressly assert lack of
minimum contacts in its original special appearance pleading, together with
counsel=s statements in open court that
Pulmosan was not making a Anot doing business in Texas@ argument, resulted in a waiver of
Pulmosan=s special appearance.

The
trial court found that Pulmosan did not waive its special appearance, relying
on Dawson-Austin, because the special appearance could properly be
amended.  Further, counsel=s statement in open court was not construed as an admission
because it was not a direct, clear and unequivocal waiver of the claim of lack
of jurisdiction but rather a statement that Pulmosan was moving forward first
on its dissolution argument. 

Rule
120a permits amendments to cure Adefects@ but does not specify the type of
defect.  Rule 120a(1) provides in pertinent part:

. . . Such special appearance shall be made by sworn motion filed prior
to motion to transfer venue or any other plea, pleading or motion; provided
however, that a motion to transfer venue and any other plea, pleading, or
motion may be contained in the same instrument or filed subsequent thereto
without waiver of such special appearance; and may be amended to cure defects.

Tex. R. Civ. P. 120a(1).








In Dawson-Austin,
the Texas Supreme Court held that Rule 120a allowed a nonresident to amend a
special appearance to cure the defect of failing to attach a verification.  968
S.W.2d at 322.  In Trejo, the Court held that an allegedly
defective affidavit submitted in support of a special appearance went to the
merits of the jurisdictional question and was not a waiver issue.  142 S.W.3d
at 308 (AAny defect in proof goes to the
merits, it is simply not a waiver issue.@).  Generally, courts do not find
waiver of a special appearance where a party does not acknowledge the
jurisdiction of the trial court or take any actions inconsistent with
challenging personal jurisdiction.  See, e.g., id. at 306-07 (seeking a
ruling on jurisdictional discovery dispute was not a waiver); Angelou,
33 S.W.3d at 276 (filing Rule 11 agreement with court prior to assertion of
special appearance was not a waiver). 

Pulmosan
argues that its pleading gave Moore Afair notice@ of its intent to challenge personal
jurisdiction and, under Texas Rule of Civil Procedure 120a and Dawson-Austin,
Pulmosan was free to amend its special appearance.  We agree.[2] 
Pulmosan stated in its special appearance that an assertion of jurisdiction
over it would offend traditional notions of fair play and substantial justice
and would violate due process.  The pleading did not contain the words Apersonal jurisdiction,@ but neither does Rule 120a.  See Tex.
R. Civ. P. 120a(1) (providing
party may file special appearance for purpose of objecting to court=s jurisdiction over the defendant=s person or property).  More
importantly, the pleading does not acknowledge the jurisdiction of the trial
court and does not make any claims or actions inconsistent with a challenge to
the trial court=s jurisdiction over Pulmosan.  See Trejo, 142 S.W.3d
at 306; Angelou, 33 S.W.3d at 276.








When
Pulmosan amended its special appearance pleading, it did not assert a wholly
new ground for lack of personal jurisdiction in its amended pleadings.  It
expanded on and gave more detail of the ground already included.  Failure to
specify details of its personal jurisdiction argument could have perhaps
justified the trial court=s denying the motion to dismiss for want of jurisdiction, but
it should not result in a waiver.  See Trejo, 142 S.W.3d at
307-08 (holding that defect in proof means trial court could properly deny
special appearance, but it is not a waiver issue); see also Dawson-Austin,
968 S.W.2d at 322 (Rule 120a permits amendments to cure defects and does not
limit kinds of defects that can be cured).

Moore
continues his waiver challenge by pointing to statements made by Pulmosan=s counsel at a discovery hearing that
Pulmosan was not making a Anot doing business in Texas@ type of argument.  We agree with the
trial court that these statements did not waive the special appearance. 
Assuming without deciding that the statements were a judicial admission of
minimum contacts, it simply disposed of one aspect of the jurisdictional
analysis.  It did not address the substantial connection or fair-play elements
of the jurisdictional inquiry and thus did not waive the entire ground that the
trial court lacked jurisdiction.

Finally,
Moore asserts that the Aone issue@ that can be raised in a special appearance is whether a
party is subject to minimum contacts.  This argument is supported by neither
the express language of Rule 120a nor the cases cited by Moore.  See
Glattley v. CMS Viron Corp., 177 S.W.3d 438, 446 (Tex. App.CHouston [1st Dist.] 2005, no pet.)
(discussing rule that court should not address merits-question in special
appearance);  I&JC Corp. v. Helen of Troy, 164 S.W.3d 877, 890 (Tex.
App.CEl Paso 2005, pet. denied) (same). 
Moore also cites several cases for the proposition that an argument that a
trial court lacks subject-matter jurisdiction cannot be made in a special
appearance.  Pulmosan did not assert lack of subject matter jurisdiction in its
special appearance pleading; rather, it argued lack of personal jurisdiction
based on traditional notions of fair play, substantial justice, and due
process.   We overrule Moore=s first issue.








III.  Personal
Jurisdiction

A.  Standards of
Review.

Whether a trial court has personal jurisdiction over a
defendant is a question of law reviewed de novo by this court.  Moki Mac, 
221 S.W.3d at 574; Kelly v. General Interior Constr., Inc., 262 S.W.3d
79, 83 (Tex. App.CHouston [14th Dist.] 2008, pet. filed).  The trial court,
however, must often resolve questions of fact before deciding the
jurisdictional question.  BMC Software Belgium, N.V. v. Marchand, 83
S.W.3d 789, 794 (Tex. 2002).  In considering the denial of a motion to dismiss
for want of jurisdiction asserted during a special appearance, the court
determines only the issue of jurisdiction, not liability.  Kelly, 262
S.W.3d at 83.  If a trial court issues findings of fact and conclusions of law,
the appellant may challenge the fact findings on legal and factual sufficiency
grounds.  Id.

The plaintiff bears the initial burden of pleading
sufficient allegations to invoke the jurisdiction of the Texas long-arm
statute.  Am. Type Culture Collection v. Coleman, 83 S.W.3d 801, 807
(Tex. 2002).  The nonresident defendant then has the burden of negating all
bases of jurisdiction asserted in the plaintiff=s allegations.  BMC
Software, 83 S.W.3d at 793.  

Texas courts may assert personal jurisdiction over a
nonresident defendant if (1) the Texas long-arm statute authorizes the exercise
of jurisdiction; and (2) the exercise of jurisdiction is consistent with
federal and state constitutional due-process guarantees.  Moki Mac, 221
S.W.3d at 574.  The Texas long-arm statute provides in pertinent part that a
non-resident does business in Texas if it Acommits a tort in
whole or in part in this state.@  Tex. Civ. Prac. & Rem. Code ' 17.042(2).  The
Texas long-arm statute, however, reaches only Aas far as the
federal constitutional requirements of due process will allow.@  Guardian
Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223,
226 (Tex. 1991). 








Federal due-process limitations are satisfied if the
nonresident defendant has established minimum contacts with the forum state,
and the exercise of jurisdiction comports with Atraditional
notions of fair play and substantial justice.@ Moki Mac,
221 S.W.3d at 575.  A nonresident establishes minimum contacts with Texas by
purposefully availing itself of the privileges and benefits inherent in
conducting business in the state.  Id.; Control Solutions, Inc. v.
Gharda Chem. Ltd., 245 S.W.3d 550, 557 (Tex. App.CHouston [1st
Dist.] 2007, no pet.).  Sellers who create Acontinuing
relationships and obligations with citizens of another state@ are subject to
jurisdiction based on their activities in the forum state.  Michiana
EasyLivin= Country, Inc. v. Holten, 168 S.W.3d 777,
785 (Tex. 2005).  In assessing minimum contacts, the quality and nature of the
contacts, rather than their number, are determinative.  Control Solutions,
245 S.W.3d at 557.  Random, fortuitous, or attenuated acts, or unilateral acts
of third-parties, are not sufficient.  Michiana, 168 S.W.3d at 785.  

A nonresident manufacturer of products need not have
offices or employees in the forum state to meet the purposeful availment test. 
Id.  Under the stream of commerce theory, a corporation that delivers
its products into the stream of commerce with the expectation that they will be
purchased by consumers in the forum state is subject to jurisdiction in suits
arising from that activity.  See World-Wide Volkswagen Corp. v.
Woodson, 444 U.S. 286, 297-98 (1980).  Pluralities of both the U.S. Supreme
Court and the Texas Supreme Court have held, however, that the mere sale of a
product to a resident is not sufficientBthe allegations
must also indicate an intent to serve the forum market.  Asahi Metal Ind.
Co. v. Superior Court, 480 U.S. 102, 112 (1987); Moki Mac, 221
S.W.3d at 577.  Examples of Aadditional conduct@ that may evidence
an intent to serve the forum market are: (1) designing the product for the
market in the forum state; (2) advertising in the forum state; (3) establishing
channels of regular communication with customers in the forum state; and (4)
marketing the product through a distributor who has agreed to serve as the
sales agent in the forum state.  Asahi Metal, 480 U.S. at 112. 








In the context of specific jurisdiction, intent to serve
the Texas market is still not alone sufficient to confer jurisdiction over a
nonresident defendant.  To assert specific jurisdiction over a nonresident
defendant, the allegations must also indicate that the defendant=s liability arises
from or relates to the defendant=s minimum contacts
with the forum state.  Moki Mac, 221 S.W.3d at 576.  A defendant=s liability arises
from or relates to its minimum contacts when there is a substantial connection
between the defendant=s contacts and the operative facts of the
litigation.  Id. at 585.

B.  Pulmosan=s Minimum Contacts
with Texas.

In his second issue, Moore contends the trial court erred
in finding that it could not exercise specific jurisdiction over Pulmosan.  In
determining whether, under the stream of commerce theory, the trial court
properly found it could exercise specific jurisdiction over Pulmosan, we must
examine the record for evidence that: (1) Pulmosan purposefully directed acts
towards Texas indicating that it intended to serve the Texas market; and (2)
Pulmosan=s liability arises
from or relates to its contacts with Texas.  See Moki Mac, 245 S.W.3d at 577, 585.








Our inquiry into Pulmosan=s purposeful
direct acts toward Texas begins with an examination of Moki Mac, the
supreme court=s recent seminal pronouncement on specific
jurisdiction.  In Moki Mac, the plaintiffs= minor son died
while on a river-rafting trip in Arizona with Moki Mac River Expeditions, a Utah-based
company.  Id. at 573.  The Texas Supreme Court examined two sets of
facts in determining whether the Utah company had purposefully availed itself
of the forum state.  First, the court reviewed Moki Mac=s marketing
efforts in Texas and found that Moki Mac knowingly sold rafting trips to Texas
residents and purposefully directed marketing efforts to Texas with the intent
to solicit business from this state.  Id. at 577-78.  Moki Mac solicited
Texas residents through mass and targeted direct-marketing email campaigns,
sending brochures and trip information to people who had previously expressed
interest in a trip, offering Afree floats@ to customers who
coordinated a group of ten or more (at least two Texas residents earned the Afree float@) and paid a fee
to a travel agency located in Houston, resulting in multiple trips involving
Texas residents.  Id. at 578.

Second, the defendant in Moki Mac established Achannels of
regular communication with its customers in Texas.@  Moki Mac,
245 S.W.3d at 578.  The defendant set up particular customers as de
facto group leaders to plan, organize, and promote its trips and had a
Texas resident as such a group leader.  Id.  In fact, the trip the
plaintiffs= son attended was planned by one such group leaderBthe plaintiffs
were not directly solicited by Moki Mac.  Id.  Moki Mac kept the
communication channels open by automatically sending information regarding new
trips, schedules, and prices to those on its mailing list who had been
customers or who had expressed an interest in a trip within a three year
period.  Id.  The Court found that Moki Mac=s advertisements
directed toward Texas and its use of channels of regular communication with its
customers showed an intent by Moki Mac to serve the Texas market, thus
satisfying the purposeful availment prong.  Id.

1. 
Evidence of Pulmosan=s direct acts toward Texas.








Like the defendant in Moki Mac, Pulmosan set up
channels of regular communication with Texas customers.  It had distributors
and OEMs in Texas that sold its products to Texas residents.  During the
relevant time period, Pulmosan had an employee in Texas whose duties included
calling on the Texas distributors to sell Pulmosan=s products. 
Pulmosan later had manufacturer=s representatives whose territory included
Texas and who also called on Texas distributors.  The representatives were paid
commissions from Pulmosan for the sale of its products.  Placing a sales
representative in the state to call on Texas distributors to sell Pulmosan=s products shows
an intent to serve the Texas market.[3] 
Moreover, the manufacturer=s representatives are similar to the de
facto group leaders the nonresident defendant used in Moki Mac and
which evidenced an intent to serve the Texas market.  Moki Mac, 221
S.W.3d at 578. 

Also like the defendant in Moki Mac, Pulmosan
regularly sent its catalogs to Aanyone who was buying from it,@ including the
Texas distributors and OEMs.  One of the Pulmosan OEMs was Clemtex, a Texas
based company who sold hoods to Moore=s employer.  In
fact, Weiss testified that Pulmosan sold products to Clemtex Afor a good many
years.@  In its 1964
catalog, Pulmosan advertised several warehouses across the United States for
its products, including one in Houston, Texas.  Pulmosan had a certificate of
authority to do business in Texas.  This evidence is sufficient to show that,
during the time Moore claimed to have used Pulmosan hoods, Pulmosan purposely
directed its products toward Texas showing an intent to serve the Texas
market.  See id. at 578; Control Solutions, 245 S.W.3d at 561.  








Pulmosan argues that the evidence does not show purposeful
availment because the distributors and OEMs were independent third parties, and
Michiana tells us that shipping products in response to actions by third
parties is not sufficient.  See Michiana, 168 S.W.3d at 785.  Pulmosan=s reliance on Michiana
is misplaced.  In that case, an R.V. manufacturer sent one product into
Texas at the unilateral request of a Texas resident.  Id. at 787. 
Unlike Michiana, Pulmosan was not passively sitting in its shop in New
York when one Texas resident called on the phone to purchase a product. 
Pulmosan sent products into Texas for Aa good many years@ and utilized a
sales employee and manufacturer=s representatives to call on and solicit
sales from Texas residents.  The fact that the distributors and OEMs were
independent of Pulmosan does not shield it from jurisdiction.  See Moki Mac,
221 S.W.3d at 578 (use of de facto group leaders, who were not agents or
employees of the company, to plan, organize and promote trips to Texas
residents was evidence of purposeful availment); Control Solutions, 245
S.W.3d at 560-61 (use of independent Texas company to distribute products was
evidence of intent to serve Texas market).

Pulmosan also contends that the warehouse in Houston cannot
support jurisdiction because it was owned and operated by an independent
manufacturer=s representative.  This argument, however, ignores the
fact that Pulmosan chose to advertise the warehouse in its catalog; it was not
the unilateral act of a third party.  Pulmosan advertised the availability of
its products in Texas, thus showing an intent to serve the Texas market. 

In sum, the evidence shows that Pulmosan set up a chain of
distribution of its products aimed at Texas, through the use of Texas
distributors and OEMs, as well as a sales employee and manufacturer=s
representatives.  This evidence satisfies the purposeful availment prong of the
jurisdictional test. 

2.  Evidence of a substantial
connection between Pulmosan=s contacts and the operative facts of the
litigation.

In Moki
Mac, the Texas Supreme Court analyzed in depth the due process requirement
that a nonresident defendant=s contacts with the forum must Aarise out of or relate to@ the litigation in order to support
specific jurisdiction.  Moki Mac, 221 S.W.3d at 579-85.  After reviewing
various approaches applied by other jurisdictions, the Court determined that,
under Texas law, there must be a substantial connection between the nonresident=s contacts and the operative facts of
the litigation.  Id. at 585.  To identify the operative facts of the
litigation, the Court selected those facts that would be the focus of the
trial.  Id.

Here,
the trial court found that no substantial connection existed because Moore
worked in and used Pulmosan=s product in Louisiana.  Moore claims that the use of the
product in another state is not a per se prohibition against a
substantial connection, citing evidence that the Pulmosan hood was purchased by
his Texas employer and passed through Texas on its way to Louisiana.  We agree
with the trial court that there is no substantial connection between Pulmosan=s contacts with Texas and the
operative facts of the litigation.








The
operative facts of Moore=s claim against Pulmosan involve products manufactured in New
York and used in Louisiana.  The alleged exposure and injury thus occurred in
Louisiana.  The relevant facts will be the state of the product as it left New
York and the conditions in which Moore used the product and worked in
Louisiana.  The fact that the product passed through Texas is not an operative
fact.  Under Moki Mac, there is no substantial connection.  See Moki
Mac, 232 S.W.3d at 588 (relationship between death on hiking trail in
Arizona and defendant=s Texas promotional activities was too attenuated to satisfy
specific jurisdiction=s due process concerns).

Moore
cites Flanagan v. Royal Body Care, Inc. to support his claim that a
substantial connection can exist even if the alleged injury did not occur in
Texas.  232 S.W.3d 369 (Tex. App.CDallas 2007, pet. denied).  It is
true that the plaintiff=s alleged use of and injury from the product in Flanagan
did not occur in Texas.  In that case, the claim at issue in the special
appearance was not the plaintiffs= claim against the nonresident defendant;
rather, the claim was one for contribution between the Texas seller of the
product and the nonresident manufacturer.  Id. at 377.  The Dallas Court
of Appeals found a substantial connection between the contacts and the
operative facts of the contribution claim because the nonresident defendant had
marketed the product in Texas, sent the product to Texas, and personally met
with the seller in Texas.  Id.  The contribution claim involved those
Texas contacts and thus satisfied the Moki Mac standard.  Flanagan
does not support Moore=s argument in this case.








Moore
also cites EMI Music Mexico, S.A. de C.V. v. Rodriguez in support of his
claim that the location of his use of and injury from the product is not
dispositive.  97 S.W.3d 847 (Tex. App.CCorpus Christi 2003, no pet.).  That
case, however, was decided before Moki Mac.  Moreover, the operative
facts are entirely different from those of this case.  The plaintiff in EMI
Music asserted a negligent entrustment of a vehicle claim.  Id. at
856.  While the accident occurred in Mexico, the negligent entrustment of the
vehicle occurred in Texas where the trip started.  Id.  Thus, a
substantial connection existed.  EMI Music is not on point.
We overrule Moore=s second issue.

IV. Conclusion

We
conclude that Pulmosan did not waive its special appearance and that the trial
court properly determined that a substantial connection did not exist between
Pulmosan=s contacts with Texas and Moore=s claims.  We therefore affirm the
trial court=s order granting Pulmosan=s special appearance.

 

 

/s/        Adele Hedges

Chief Justice

 

 

Judgment rendered and Opinion filed
December 9, 2008.

Panel consists of Chief Justice
Hedges and Justices Guzman and Brown.

 

 









[1]  When asked whether he knew the type of plants,
factories, or contractors who would be the end users for the products, Weiss
said that almost every type of industry was using them, but he did not know
exactly to whom the distributors sold Pulmosan products.  





[2]  Pulmosan further argues that even if its pleading
was defective, once it challenged personal jurisdiction, Moore was required to
specially except and provide Pulmosan with an opportunity to clarify its
pleading or cure any defects.  Pulmosan relies upon Low v. Henry, 221
S.W.3d 609 (Tex. 2007); Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607 (Tex.
2004); and Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887 (Tex.
2000).  We acknowledge that Texas is a Afair
notice@ pleading state and that a party must specially except
and give the other party a chance to cure.  But the cases Pulmosan relies upon
are not special appearance cases.  See Low, 221 S.W.3d at 612
(addressing motion for sanctions); Garza, 164 S.W.3d at 616-17
(addressing plaintiff=s petition in employment case); Auld, 34 S.W.3d
at 897 (addressing defendant=s answer for
fair notice of intent to rely on statutory damages cap). 

 





[3]  Pulmosan argues that specific jurisdiction cannot
rest solely on the shoulders of this one sales representative.  There is
evidence, however, of other acts by Pulmosan which showed an intent to serve
the Texas market.  See infra.  In addition, courts must look to the
quality and nature of the contacts rather than their number.  See Control
Solutions, 245 S.W.3d at 557.