

# NUMBER 13-13-00102-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**BENXI NORTHERN STEEL
PIPE CO., LTD.**                                          **Appellant,**

**v.**

**ATLAS TUBULAR, L.P., ET AL.,**                          **Appellees.**

---

### On appeal from the 214th District Court
### of Nueces County, Texas

---

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Wittig[1]
### Memorandum Opinion by Justice Wittig

Appellant, Benxi Northern Steel Pipe Co., Ltd. (Benxi), brings this accelerated,

---

[1] Retired Fourteenth Court of Appeals Justice Don Wittig assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003 (West 2005.)

interlocutory appeal of the trial court's order denying its special appearance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West Supp. 2011). The original plaintiff, Royal Productions Co., Inc. (Royal), appellee, sued Benxi. Royal also joined Atlas Tubular, L.P., (Atlas), Vass Pipe & Steel Co., Inc., (Vass), Commercial Metals Company d/b/a Commercial Metals of Corpus Christi, (CMC), Shanghai MinMetals Materials & Products Corps, (Shanghai), and Womble Company, Inc. (Womble), appellees. Several of the appellees have cross-claims against Benxi for contribution or indemnity. By four issues, appellant contends that: (1) the trial court erred as a matter of law in overruling its special appearance; (2) erred as a matter of law in finding it engaged in minimum contacts with Texas sufficient to subject it to specific jurisdiction; (3) erred as a matter of law in finding that it purposefully sought to establish contacts with Texas; and (4) the trial court's exercise of jurisdiction offends the traditional notions of fair play and substantial justice. We affirm.

## I. BACKGROUND

Royal is a Texas corporation engaged in the oil and gas industry. It had a master service agreement to purchase pipe from Atlas. Royal purchased 40,068 feet of 6-5/8" new Benxi pipe from Atlas. Contrary to Benxi's mill certification that the pipe had been hydrostatically tested, it was not. Two sections of pipe manufactured by Benxi suffered a through-wall mill defect, which would have been discovered had the pipe been tested, or even re-tested as Benxi represented. Evidence suggests no testing was done by Benxi. According to Benxi, the supply chain originated with Benxi, then Shanghai, CMC Dallas, Vass, and Atlas, then Royal. Womble applied a pipe coating before the Vass transfer. While the pipe was purportedly sold to Shanghai FAS (free

2

along side) in Xingang, China (near Benxi's manufacturing facility) in December 2006, this was a purely paper transaction. Shanghai never took possession and the pipe was shipped from China directly to the Port of Houston where CMC took delivery and in turn, sold the Benxi pipe to Vass, then Atlas, in July 2007. Royal received the pipe in about August 2007.

Dallas based CMC, a Texas corporation, had several personal contacts with Benxi at its China plant, and received a Benxi catalog which showed Dallas, Texas as the sole point of international sales to the United States. The Shanghai corporate representative testified that Benxi sought additional sales to CMC Dallas. The purchase orders from Shanghai to Benxi were for CMC Dallas Trading in Irving, Texas, with delivery called for at the Port of Houston (the arrival port). Benxi did not manufacture the pipe until it had the CMC order. After the Houston delivery and Royal's receipt, the pipe was installed in the Gulf of Mexico off the shore of Alabama. The mill test certificate, which acts as a "birth certificate" for the pipe, specifically showed CMC as the consumer and customer and the pipe's destination as "Houston."

## II. APPLICABLE LAW

To render a binding judgment, a court must have both subject matter jurisdiction over the controversy and personal jurisdiction over the parties. *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex. 1996). Whether a court has personal jurisdiction over a defendant is determined as a matter of law, which appellate courts review de novo. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002). When, as here, a trial court does not issue findings of fact or conclusions of law to support its special-appearance determination, we presume that all factual disputes were resolved in

3

favor of the trial court's ruling. *Id.*

Texas courts have personal jurisdiction over a nonresident defendant when: (1) the Texas long-arm statute provides for it; and (2) the exercise of jurisdiction is consistent with federal and state due process guarantees. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex. 2002). Our long-arm statute reaches "'as far as the federal constitutional requirements for due process will allow.'" *Id.* (quoting *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)). Consequently, the statute's requirements are satisfied if exercising jurisdiction comports with federal due process limitations. *Id.*

If a defendant has never invoked the protections that a forum offers its residents, or has no purposeful contact with it, the forum court's jurisdiction is confined. *Spir Star AG v. Kimich,* 310 S.W.3d 868, 872 (Tex. 2010). Personal jurisdiction over nonresident defendants is constitutional only when: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 167 (Tex. 2007)).

Although the "fair play" and "substantial justice" test is imprecise, its import is given light when viewed in the context of the "minimum contacts" a defendant has with the forum. *Id.* (*citing Int'l Shoe,* 326 U.S. at 316). Significant contacts suggest that the defendant has taken advantage of forum-related benefits, while minor ones imply that the forum itself was beside the point. *Id.* When a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction,

4

it is both fair and just to subject that defendant to the authority of that forum's courts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1984).

A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *CSR,* 925 S.W.2d at 595. General jurisdiction exists when a defendant's contacts are continuous and systematic, even if the cause of action did not arise from activities performed in the forum state. *Id.*

A court has specific jurisdiction over a defendant if its alleged liability arises from or is related to an activity conducted within the forum. *Id.* Unlike general jurisdiction, which requires a "more demanding minimum contacts analysis," *id.* at 595, specific jurisdiction "may be asserted when the defendant's forum contacts are isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state." *Spir Spar*, 310 S.W.3d at 873 (citing Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1067.5 (3d ed. 2002). In such cases, "we focus on the 'relationship among the defendant, the forum[,] and the litigation.'" *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007) (quoting *Guardian Royal,* 815 S.W.2d at 228). Specific jurisdiction is appropriate when: (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts. *See Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 338 (Tex. 2009).

The "touchstone of jurisdictional due process [is] 'purposeful availment.'" *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex. 2005). Purposeful availment requires a defendant to seek some "benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* at 785. Thus, sellers who reach beyond one

5

state and create continuing relationships with residents of another state are subject to the specific jurisdiction of the latter in suits arising from those activities. *Moki Mac,* 221 S.W.3d at 575.

Notably, a seller's awareness "'that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.'" *CSR,* 925 S.W.2d at 595 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal.,* 480 U.S. 102, 107 112 (1987) (plurality op.)). Precedent requires some "additional conduct"—beyond merely placing the product in the stream of commerce—that indicates "an intent or purpose to serve the market in the forum State." *Asahi,* 480 U.S. at 112; *see Moki Mac,* 221 S.W.3d at 577; *Michiana,* 168 S.W.3d at 786.

As the United States Supreme Court stated in *World–Wide Volkswagen Corp. v. Woodson*, purposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates or independent distributors):

> [I]f the sale of a product of a manufacturer . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer . . . to serve directly or indirectly*,* the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

444 U.S. 286, 297 (1980).

There are limitations inherent in this rule. First, it is limited to the specific jurisdiction context, because stream-of-commerce analysis "is relevant only to the exercise of specific jurisdiction; it provides no basis for exercising general jurisdiction over a nonresident defendant." *Purdue Research Found. v. Sanofi–Synthelabo, S.A.,*

6

338 F.3d 773, 788 (7th Cir. 2003); *accord D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 106 (3rd Cir. 2009); *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 380 (5th Cir. 2002) (citations omitted)*.*

Second, specific jurisdiction is limited to claims that "arise out of or relate to" a nonresident's forum contacts. *Burger King,* 471 U.S. at 472; *Retamco,* 278 S.W.3d at 338. In such cases, there must be a "substantial connection" between the defendant's contacts and the operative facts of the litigation. *See Moki Mac,* 221 S.W.3d at 585. So when a nonresident's only contacts with Texas involve indirect sales through a distributor or subsidiary, specific jurisdiction is limited to claims arising out of those sales. *Spir Spar*, 310 S.W.3d at 874–75.

Many transactions can be structured to avoid any benefit from or availment of Texas law—but not all. *Spir Spar*, 310 S.W.3d at 875. A nonresident manufacturer does not avoid Texas law merely by forming a Texas affiliate or utilizing a Texas distributor to sell its products in Texas markets. *Id.* Just as manufacturers cannot escape liability for defective products by selling them through a subsidiary or distributor, neither can they avoid jurisdiction related to such claims by the same means. *Id.* The question therefore is whether Benxi has purposefully directed acts towards Texas or purposefully availed itself of the benefits and protections of Texas law. We conclude that it has.

When an out-of-state manufacturer like Benxi specifically targets Texas as a market for its products, that manufacturer may be subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas

7

distributor or other channel.[2]   *See Asahi,* 480 U.S. at 112.   In such cases, it is not the actions of the Texas intermediary that count, but the actions of the foreign manufacturer who markets and distributes the product to profit from the Texas economy.   *Spir Spar*, 310 S.W.3d at 874.

We are mindful that it is the quality and nature of the contacts, rather than their number (or the number of individual products ultimately shipped to the forum state), that must be the focus of this analysis.   *Coleman,* 83 S.W.3d at 806; *Guardian Royal,* 815 S.W.2d at 230 n 11.   The record evidence conflicts as to the degree that Benxi deliberately structured some of its business so that title to its goods transferred at foreign or other state ports.   Nevertheless, it demonstrably knew that the ultimate destination of its pipes were largely in Texas.   Benxi made numerous direct shipments to Texas as discussed below.   The defective pipes in question were specifically destined for a Texas customer and delivered at the Port of Houston.   In order for specific jurisdiction to attach, there must be a substantial connection between Benxi and Texas resulting from the action or conduct of the nonresident defendant purposefully directed toward the forum state.   *Guardian Royal,* 815 S.W.2d at 226.

Benxi's contacts clearly exceeded the ephemeral contacts resulting from periodic mailings based solely upon affiliation or membership, which were deemed insufficient in *National Industrial Sand Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex. 1995).   Similarly, these contacts are more than the single conversation and the purchase of products from a Texas company found to be insufficient in *BMC*, 83 S.W.3d at 796.   While there is

---

[2]   Royal's claims are not limited to product liability.   It also made claims for negligence, deceptive trade practices, implied warranties, fraud, and fraudulent misrepresentations.

evidence that Benxi sometimes sought to structure its transactions to avoid the benefits and protections of Texas laws, on many other notable occasions it did not, and therefore we are not precluded from applying the legal fiction of consent. *See Coleman,* 83 S.W.3d at 808. Further, Benxi's multiple admissions of direct and systematic contract with its Texas and US customers stand in direct opposition to its position taken with both the trial court and on appeal.

### III. SPECIFIC JURISDICTION

Benxi and its opposite parties paint two very different pictures regarding specific jurisdiction. According to Benxi, it dealt only with Shanghai, another Chinese company. Benxi also claims CMC allegedly dealt only with Shanghai through two sales contracts dated May 22, 2006 and May 27, 2006, which provided all disputes would be settled by Chinese law and that the pipe was delivered to a dock in Tianjin, China. CMC's purchase orders to Shanghai included delivery terms of FAS in Xingang, China. CMC hired and paid for the ships that carried the pipe from China to Houston. Further, Benxi is not a Texas resident, it is organized and registered under Chinese law with its principal office in China, and it does not maintain a registered agent for service in Texas. According to Benxi, it has never maintained an office, plant, or warehouse in Texas, has never owned or leased property in Texas, has never designed or manufactured products in Texas, has not traveled to Texas, has no mailing address, phone listing or other property in Texas, and in short, has no nexus to Texas. Benxi does admit "limited sales of pipe to Texas based companies or foreign based companies" where product was shipped to Texas between 2006 and 2008, the relevant time period. It admits twelve sales of pipe to Texas-based companies or foreign-based companies with the product

shipped to Texas. Products were not shipped to Texas after 2008 because of anti-dumping sanctions imposed by the United States Department of Commerce. The original lawsuit was filed in 2008.

In the anti-dumping case, Benxi submitted information to the United States International Trade Administration that was quite contrary to its position in this case. There, it took the following inconsistent positions: (1) The first sale to the United States was recorded on Benxi's "accounts received ledger"; (2) Benxi Pipes *directly exported all merchandise sold to the United States* during the period in question; (3) Benxi *directly exported all subject merchandise sold to the United States and there were no intermediate parties involved* in its United States sales; (4) *Only Benxi was involved in the production and sale* of the merchandise; *no subsidiaries or other affiliates were involved* in its sales; (5) All merchandise exported to the United States was produced by Benxi; (6) The mill test certificate for the first sale was provided; (7) Exhibit 8 provided a signed purchase order/contract between Benxi and its United States customer; it illustrates *there were no third parties involved* in this transaction; and (8) In describing how Benxi independently set prices, it stated *it received inquiries for quotations and it replied to such inquiries* with quoted prices. (Emphasis added). If the price was acceptable, the two parties completed the transaction and signed the contract. Benxi provided email documentation to show independent price negotiations. These admissions by Benxi were later confirmed and sworn to by the Chairman of the Board of Benxi in his deposition in this case.

U.S. Customs' documents showed some 140 shipments from Benxi into Texas during the two years preceding the lawsuit. Benxi admitted in discovery that over

twenty-six million pounds of pipe were sold and shipped to Texas. In one year, the Texas sales comprised about 5.4% of Benxi's worldwide production. Other discovery showed twelve purchase orders for more than 15.4 million pounds of pipe to be delivered directly from Benxi to Sunbelt Group into the Port of Houston. Benxi sold pipe directly to M.G. Mahar at the Port of Houston. Other documented direct sales from Benxi into Texas included purchases from QT Trading, Insight Trading, Pipe & Tube Supplies, and Arcelor. Texas-based CMC alone received some ninety-six shipments of Benxi pipe, including the two specific orders which contained the defective untested pipe discussed above.

At the relevant time, Benxi also maintained an interactive English website available and accessible in Texas.[3]

The defective pipe in question was ordered through Shanghai specifically to fulfill the order of CMC Dallas. Benxi sent the pipe to a Chinese port near its manufacturing facilities in approximately December 2006. CMC loaded the pipe onto a cargo vessel hired by CMC. The intermediary Shanghai never took possession of the pipe; Shanghai's role was purely paper work. The pipe then shipped directly to the Port of Houston pursuant to CMC's direction, where Vass in turn took delivery. Vass sold to Atlas who in turn sold the pipe to Royal about August 2007.

Before Texas-based CMC decided to purchase Benxi pipe, it visited the Benxi facilities in China on several occasions. Benxi provided a sales catalog to CMC personnel. Benxi knew CMC was a customer of Shanghai, and hoped CMC would

---

[3] The degree of interactivity, if any, is disputed.

purchase more Benxi products.[4]   Only after its direct contact with Benxi and inspection of its facilities did CMC order pipe from Benxi.   Purchase orders 59159 and 59178 to Shanghai identify "CMC Dallas Trading" as the customer and listed the billing address in Irving, Texas.   "Houston, Texas, USA" was specifically designated as the discharge port.   The orders required both the Certificates of Origin and Mill Test Certificates, prepared by Benxi, to state "Commercial Metals Company–CMC Dallas Trading" as the customer.   The contract clearly stated in English (and Mandarin) "CMC Dallas" and made numerous references to "Houston" as the arrival port.   The Benxi corporate representative, general manager Wang, said Benxi did not care who Shanghai sold to "unless it is specified in the contract with us."   CMC Dallas was specified in the contract.

In addition to the contract reference to CMC Dallas and delivery to Houston, the mill certificates issued by Benxi showed the consumer and customer to be Commercial Metals Company, Dallas Trading Division, and showed Houston as the destination for the pipe.

CMC revisited Benxi three additional times in the relevant time period and engaged in direct talks with Benxi about its Texas-bound products.

The mill certificates specifically represented that the pipes in question were hydrostatically tested and met standards, which representations proved to be false. Benxi also referred to the certificates as "Quality Assurance Certificates."   After some earlier failures to properly test and certify its pipe, Benxi represented that the defective pipe had been re-tested and passed.   Before Royal received the defective pipe, CMC

---

[4]   The testimony was from the Shanghai corporate representative.

suspended its pipe orders with Benxi and resumed purchases only when Benxi assured CMC that the pipe was re-tested. Expert testimony indicated that the pipe could not have survived the testing and therefore the purported testing had not taken place. The defect was a "through-wall mill defect."

The trial court must often resolve questions of fact before deciding the jurisdictional question. *BMC Software,* 83 S.W.3d at 794. In considering the denial of a motion to dismiss for want of jurisdiction asserted during a special appearance, the court determines only the issue of jurisdiction, not liability. *Kelly v. Gen. Interior Const., Inc.*, 262 S.W.3d 79, 83 (Tex. App.—Houston [14th Dist.] 2008), *rev'd in part*, 301 S.W.3d 653 (Tex. 2010). Because the trial court did not issue findings of fact or conclusions of law to support its denial of the special appearance, we presume that all factual disputes were resolved in favor of the trial court's ruling. *BMC Software,* 83 S.W.3d at 794.

The plaintiff bears the initial burden of pleading sufficient allegations to invoke the jurisdiction of the Texas long-arm statute. *Am. Type Culture*, 83 S.W.3d at 807. The nonresident defendant then has the burden of negating all bases of jurisdiction asserted in the plaintiff's allegations. *BMC Software*, 83 S.W.3d at 793. The Texas long-arm statute provides in pertinent part that a non-resident does business in Texas if it "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(2). Royal's pleadings contain sufficient allegations to invoke Texas jurisdiction.[5] In Royal's active pleading, its Eighth Amended Petition, it asserts Benxi negligently failed

---

[5] Cross-claims against Benxi also invoke Texas jurisdiction.

13

to properly inspect, test, or provide non-defective materials, resulting in significant damages to Royal. Under the DTPA, it pled defendants misrepresented the characteristics, uses and benefits of the pipe sold to Royal, breached express and implied warranties, and its conduct was a producing cause of property damage to Royal. Royal similarly pled breach of contract, violation of implied warranties of merchantability and fitness, and product liability by providing defectively manufactured or designed steel pipe, which was not properly hydrostatically tested, or tested at all, which caused damages to Royal.

A nonresident establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in the state. *Moki Mac*, 221 S.W.3d at 575; *Control Solutions, Inc. v. Gharda Chem. Ltd.*, 245 S.W.3d 550, 557 (Tex.App.—Houston [1st Dist.] 2007, no pet.). Benxi's minimum contacts include over one hundred sales to Texas customers, and tens of thousands of tons of product sales including up to nearly 6% of its world-wide production during at least one year of the relevant period.

Sellers who create "continuing relationships and obligations with citizens of another state" are subject to jurisdiction based on their activities in the forum state. *Michiana*, 168 S.W.3d at 785. Benxi exhibited such relationships with Texas-based CMC with over ninety sales. Benxi personally met with CMC multiple times at its plant in China to discuss purchases, sales, quality, testing, and the suspension of CMC purchases due to lack of testing. Benxi assured CMC and Shanghai that questionable pipe would be re-tested and quality assured. Benxi conducted ongoing business with multiple other Texas entities.

14

Benxi's contacts included furnishing mill certificates to the specifications of CMC and following the explicit instructions of purchase orders numbers 59159 and 59178, naming CMC Dallas as the customer for Benxi's pipe, and specifying the Port of Houston as the delivery site. These orders included the actual pipe delivered in Texas to Royal. In *Moki Mac*, the supreme court set out three issues in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

221 S.W.3d at 575 (internal citations and quotations omitted).

While Benxi's contacts also included some unilateral activity, both its statements to the United States Department of Commerce and its enumerated activities with CMC and multiple other Texas-based entities illustrate deliberate and systematic first-party involvement on its part. Contacts were purposeful and not random, fortuitous, or attenuated acts, or the unilateral acts of third parties. *See Michiana*, 168 S.W.3d at 785. A nonresident manufacturer of products need not have offices or employees in the forum state to meet the purposeful availment test. *Id.* Benxi fostered its relationship with CMC Dallas, including multiple in-country personal meetings and over 100 shipments to in state customers. According to the testimony, Benxi specifically sought increased sales in Texas, promised better quality control, and even assured that it would be responsible for legal damages for any failed pipe.

15

Benxi argues that the trial court erred in applying the stream of commerce doctrine, again citing *World-Wide Volkswagen*. This is because Benxi contends the allegedly defective merchandise failed to meet the test that it "has there been the source of injury to its owner or to others." *See World Wide Volkswagen* 444 U.S. at 297. In other words, Benxi argues the stream of commerce doctrine applies only when the harm occurs in the forum state. We disagree. First, the trial court need not have applied the stream of commerce doctrine in order to reach its conclusion that jurisdiction had been obtained. Second, Benxi caused damages in Texas. And third, unlike the situation in *Moki Mac*, 221 S.W.3d at 577, this was not a mere sale of a product to a Texas resident. Due process requires that a nonresident defendant take action that is purposefully directed toward the forum state. *Id.* Benxi did not sell its product in one state and then end up being sued in a downstream state. Benxi knowingly, intentionally, and actively marketed its products in Texas. The actual claimed defective and misrepresented pipe was delivered to Texas customer CMC in Houston. Benxi engaged in multiple other significant and purposeful availment as already discussed.

Benxi cites a memorandum opinion, *Steron v. Yuma Exploration & Production Co.*, No. 01-06-00414-CV, 2006 WL 2864478 (Tex. App.—Houston [1st Dist.] Oct. 5, 2006, no pet.) (mem. op.), in support of its position. In this case, Steron was a foreign manufacturer that sold and shipped a batch of gate valves to a Louisiana company who resold the valves to another Louisiana company, who in turn shipped one single valve to a Texas customer. *Id.* at *1. The valve was later used for a project back in Louisiana where it caused damage to a customer's oil well. *Id.* Suit was filed in Texas. The Houston court held the stream of commerce doctrine would be relevant to Louisiana

16

process, but not Texas. *Id.* The only forum alleged to be a source of injury was Louisiana, and no allegations were made that the valve caused an injury in Texas. *Id.* Here, Benxi marketed its products directly to a Texas resident, listed the Texas resident as the customer, and shipped the products to Houston. Furthermore, in its pleadings, Royal did not specify Alabama either as the source or sole source of injury.[6] Appellees Atlas, Vass, CMC, Shanghai, and Womble all allegedly suffered injury from Benxi, and have potential liability in Texas to Royal. They also correspondingly have indemnification claims against Benxi in this forum. Damages occurred to Royal in both jurisdictions.

Royal's claims of deceptive trade practices, negligence, implied warranties, fraud, fraudulent misrepresentation, and product liability all occurred in whole or in part in Texas. Where an individual commits a tort in whole or in part in Texas, he satisfies the jurisdictional requirements of the Texas long-arm statute. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Ring Power Sys. v. Int'l de Comercio y Consultoria, S.A.,* 39 S.W.3d 350, 353 (Tex. App.—Houston [14th Dist.] 2001, no pet.). For example, without Benxi's false representations of hydrostatic testing found in its Houston delivered mill certificates, the defective pipes never would have left Texas and the later, extenuated damages to the offshore pipeline in Alabama would have been averted. The elements of negligence, deceptive trade practices, implied warranties, and products liability claims were complete when Royal took delivery of the defective pipe in Texas.

This court has adopted the "substantial connection" standard and has held that

---

[6] Royal suffered injury in Texas, although the more serious later damages to Royal occurred in the Gulf of Mexico off the shore of Alabama. Royal's initial claims matured upon receipt of the defective pipe. The pipe was untested, not as represented, and contained a through-wall mill defect.

even a single Texas contact may support the exercise of specific jurisdiction if the suit arises out of that contact; under this test, a substantial connection must exist between the contact and the cause of action in the forum state. *EMI Music Mexico, S.A. de C.V. v. Rodriguez*, 97 S.W.3d 847, 859 (Tex. App.—Corpus Christi 2003, no pet.). A "substantial connection" between the nonresident defendant and Texas arises from the action or conduct of the nonresident defendant purposefully directed toward Texas. *Id.* (citations omitted); *see also J & J Marine, Inc. v. Le*, 982 S.W.2d 918, 923 (Tex. App.—Corpus Christi 1998, no pet.). This is consistent with the supreme court holding in *Spir Spar*, 310 S.W.3d at 874–75 (concluding that there must be a substantial connection between the defendant's contract and the operative facts and that similar products sold would not create a substantial connection). Indeed, Benxi itself also asserts the substantial connection principle in its argument.

Next, Benxi argues that even if the stream of commerce doctrine applies, Royal's claims are not substantially connected to Benxi's Texas contacts. Benxi claims lack of substantial connection because Shanghai was an intermediary, even though Benxi knew Shanghai would sell and ship the pipe to CMC in Texas. It cites *CMMC v. Salinas*, 929 S.W.2d 435, 439 (Tex. 1996) in support of this argument. Unlike Benxi's systematic and significant involvement with Texas, CMMC's wine-producing equipment did not regularly find its way to Texas. *Id.* No effort was made to market CMMC's equipment in Texas, other than by advertisements in magazines with national circulation. *Id.* The purchase was an isolated event. *Id.* "CMMC's mere knowledge that its winepress was to be sold and used in Texas and its wiring the machine for use in the United States were not sufficient to subject CMMC to the jurisdiction of Texas courts." *Id.* The evidence

18

simply did not show "that CMMC designed products for use in Texas, or that it made any effort to market them here, or that it took any other action to purposely avail itself of this market." *Id.* "There is no flow of products from CMMC to Texas; there is scarcely a dribble." *Id.* The case at bar is inapposite.

Benxi next cites *Exito Electronics., Co., Ltd. v. Trejo*, 166 S.W.3d 839, 855 (Tex. App.—Corpus Christi 2005, no pet.), to support its position. There, we held that there was "no direct evidence here that Exito–Taiwan's product would be delivered to Texas retail stores or that it knew Texas consumers would purchase the cords. There is further no evidence in this case to track the number of Exito–Taiwan's products sold in Texas or that sales were regularly made by GE Lighting to retailers or consumers in Texas." *Id.* However, we also held that the trial court had general jurisdiction because the company purposefully availed itself of the privilege of conducting activities in Texas and could reasonably have anticipated being hailed into a Texas court. *Id.* (citing *Burger King,* 471 U.S. at 475; *World-Wide Volkswagen,* 444 U.S. at 297).

Here, there is direct evidence that Benxi pipe was delivered to a specific Texas customer at the Port of Houston. The number of sales was tracked, and sales were regularly made, including the pipe in question. Benxi certified the pipe for the Texas customer, specifically named the customer, a Texas port, and made quality assurances to its Texas customer. Further, as Royal argues, *Spir Spar* holds that a manufacturer is subject to specific personal jurisdiction in Texas when it intentionally targets Texas as the market place for its products and the use of a distributor intermediary provides "no haven from the jurisdiction of a Texas court." *Spir Spar*, 310 S. W. 3d at 871.

Benxi next argues from *Moore v. Pulmosan Safety Equip. Corp.*, 278 S.W.3d 27,

19

38 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (stating that no substantial connection existed between nonresident defendant's contacts with Texas and operative facts for injury caused in Louisiana by product made in New York). The lack of substantial connection was remarkably demonstrated by the fact that Pulmosan had not done business in Texas, or elsewhere, since its dissolution in 1986. *Id.* at 32. The fact that the product passed through Texas was not an operative fact, and under *Moki Mac*, there was no substantial connection. *Id.* at 38 (citing *Moki Mac*, 221 S.W.3d at 588 (holding that the relationship between death on hiking trail in Arizona and defendant's Texas promotional activities was too attenuated to satisfy specific jurisdiction's due process concerns)).

In *Moore*, the appellate court was provided with the trial court's findings of fact and conclusions of law specifically finding no substantial connection. *Id.* The trial court found that although there was purposeful availment, no substantial connection existed because the plaintiff worked in and used Pulmosan's product in Louisiana. *Id.* at 38. All the operative facts occurred in New York or Louisiana. Not so for Benxi. The operative facts will first center on Benxi's specific quality assurances made from China to Texas that the pipe was hydrostatically tested, met specifications, and was for purchase and use in a Texas-centered oil field application. Benxi specifically manufactured the pipe for CMC Dallas. The mill test certificates were created by Benxi and specifically named the Texas customer to be served through the Port of Houston. Benxi personally met with employees and officers of CMC, Texas residents, Benxi specifically represented to Shanghai, and by direct statement or inference to CMC, Royal, and other customers, that the prior testing failures would be corrected.

An email dated November 9, 2006 from Shanghai to Benxi, prior to the shipments in question, noted the quality problems and that "we/Benxi Northern Steel Pipes Co., Ltd. will assume full responsibility" for the current losses and bear corresponding losses as well. The email made numerous references to Texas-based CMC and noted CMC employees' prior and forthcoming visits to Benxi. Notably, the email states CMC will inform all clients to retest the "problematic steel pipes." A partial compensation payment of $200,000 to CMC was stated to be "the first installment of compensation for the losses." Benxi's claimed improvements were communicated to CMC. Benxi was told CMC was postponing payment for the 2,500 tons of goods shipped earlier.

Benxi responded by letter dated November 13, 2006. It claimed to have performed a second pressure test and no quality problems were found. Benxi stated: "We will be responsible for any quality problems of our products and bear the economic losses resulting from such quality problems accordingly." The letter closes: "For your company and CMC, please do not worry about it!"

Unlike *Moore*, the elements of Royal's claims were met when the quality-certified defective pipe reached Texas and Royal.

Significantly closer in point is the Dallas case of *Flanagan v. Royal Body Care, Inc.*, 232 S.W.3d 369, 377 (Tex. App.—Dallas 2007, pet. denied). The evidence showed that RBC's claim for contribution derived from a products-liability case in which the Wards alleged that Microhydrin, containing Flanagan Microclusters and Crystal Energy, were inadequately labeled and negligently marketed. *Id.* The evidence also showed that Flanagan had to approve all labels and marketing of RBC's products containing the inventions Flanagan Microclusters and Crystal Energy. *Id.* It further

21

showed that Flanagan purposefully marketed its ingredients in Texas. *Id.* And a few months after a business dispute ended the relationship between Flanagan Technologies and RBC, Flanagan personally met with RBC in Texas to seek its business once again. *Id.* The Dallas court concluded the evidence to be legally and factually sufficient to show that Flanagan's potential liability arose from or related to its contacts with Texas. *Id.*

Here, Royal's claims are also attended by multiple cross-claims for contribution or indemnity against Benxi. Although it is true that a greater part of Royal's damages occurred in the Gulf of Mexico, Benxi's claimed liability directly arose from or relates to its minimum contacts with the forum state. *Moki Mac*, 221 S.W.3d at 576.

Finally, Benxi cites *Michiana*, 168 S.W.3d at 784, where, in a single transaction, an RV was constructed and equipped outside Texas, was paid for outside Texas, and was shipped to Texas at the plaintiff's request and entirely at his expense. The solitary purchase from the out-of-state dealer was initiated by the plaintiff to get a cheaper price. *Id.* at 784. The supreme court held that "[b]ecause Michiana's only contact with Texas was Holten's decision to place his order from there," Texas lacked jurisdiction. *Id.* at 794. The gist of the opinion addresses the lack of purposeful availment. *Id.* at 786. The case is not in point because Benxi's contacts were purposeful and substantial in that its activity "was aimed at getting extensive business in or from the forum state." *Id.* at 789–90.

We conclude that the business interactions between Benxi and appellees were not random, fortuitous, or attenuated contacts. *See Coleman,* 83 S.W.3d at 806; *Guardian Royal,* 815 S.W.2d at 226. Rather, they were purposeful, substantial,

systematic, and continuous, such that Benxi "purposefully availed" itself of the privilege of conducting activities in Texas and could reasonably have anticipated being called into a Texas court. *See Burger King,* 471 U.S. at 475; *World–Wide Volkswagen*, 444 U.S. at 297. Benxi's claimed liability directly arose from or relates to its minimum contacts with the forum state. *See Moki Mac*, 221 S.W.3d at 576. The trial court has specific jurisdiction over Benxi because its alleged liability arises from or is related to an activity conducted within the forum. *CSR,* 925 S.W.2d at 595.

## IV. Fair Play and Substantial Justice

In addition to minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Retamco,* 278 S.W.3d at 338. If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice. *Id.* at 341. We undertake this evaluation in light of the following factors, when appropriate: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies. *Spir Spar,* 310 S.W.3d at 878; *Asahi,* 480 U.S. at 113.

Benxi asserts it would be unduly burdened if it were required to litigate here. It contends that it is a completely domestic Chinese company without employees or other representatives or offices here. Texas and its laws are manifestly unfamiliar to Benxi. Texas has minimal interest in the dispute where the pipe failed off the Alabama Gulf

23

Coast. Royal's interest will not be prejudiced because other defendants are present and have not challenged jurisdiction. Benxi's employees live in China and speak only Chinese, thus requiring interpreters. Benxi largely structured its business to avoid liability for sales by consummating most sales in China. And when it did contract with Texas customers, it often specified that Texas law would not govern. In sum, Benxi asserts it will be subject to unique burdens.

On balance, asserting personal jurisdiction over Benxi as to the product liability, misrepresentations, fraud, negligence, and implied warranties claims, and notably appellees' cross-claims for contribution or indemnity, would not offend traditional notions of fair play and substantial justice. *See Spir Spar,* 310 S.W.3d at 879. Subjecting Benxi to suit in Texas certainly imposes a burden on it, but the same can be said of all nonresidents. Distance alone cannot ordinarily defeat jurisdiction. *Id.* (stating that distance alone ordinarily is not sufficient to defeat jurisdiction because modern transportation and communication have made it significantly less burdensome for a party to defend itself in a State where it engages in economic activity). Particularly given that Benxi stated in correspondence it would "bear the economic losses" of the pipe defects, the burden of litigating in Texas is not so severe as to defeat jurisdiction. The burden is also mitigated by the convenience to the other parties of litigating in the forum where the alleged misrepresentations and other related conduct were directed. The allegations that the Benxi committed a tort in Texas against a resident implicates a serious state interest in adjudicating the dispute. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, (1984) (state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory).

24

Texas maintains a world leadership role in the oil and gas industry and has a heightened interest in the safety and efficacy of oil and gas extraction and delivery. It is noteworthy that the Chinese company Shanghai did not raise Benxi's myriad objections and presumably would be disadvantaged to be subjected to yet another jurisdiction to finally resolve the claims between itself and Benxi and the Texas pipe purchasers. Benxi would have one half of the Chinese defendants litigate here and the other half in China. Thus, the international system would be better served to resolve the claims by and against Shanghai and against Benxi in the present forum. Not only would Royal face an undue burden were it forced to litigate its claims against Benxi in China, but because the claims against the other appellees will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place. *See Retamco*, 278 S.W.3d at 341 ("[The plaintiff] has an interest in resolving this controversy in Texas because that is where the litigation began.") Benxi's letter of November 13, 2006 facially appears to be an agreement to indemnify both Shanghai and CMC. Finally, because these claims will be litigated with CMC, Atlas, Shanghai, Vass, and Womble in a Texas court, judicial economy is promoted. *Spir Star*, 310 S.W.3d at 879). The assertion of jurisdiction comports with both the interstate and international judicial system's interest in obtaining the most effective resolution of the controversy and the other nations shared interest in furthering fundamental substantive social policies.

We conclude that the burden on Benxi of litigating in a foreign jurisdiction is minimal and outweighed by Texas' interests as well as international interests in adjudicating the dispute in this single forum*. Id.* at 879–80.

25

## V. CONCLUSION

We overrule Benxi's issues concerning specific jurisdiction. We need not address the general jurisdiction issue. *See* TEX. R. APP. P. 47.1. We affirm the order of the trial court denying Benxi's special appearance.

DON WITTIG,
Justice

Delivered and filed the
12th day of December, 2013.